# EXHIBIT 1

| | |
|---|---|
| **From:** | John P. DeRose <john@johnderoselaw.com> |
| **Sent:** | Tuesday, June 14, 2016 4:24 PM |
| **To:** | Mike Wall |
| **Subject:** | Re: McGreal v. Village of Orland Park et al |

Michael:

Please read the case law. You are not entitled to your attorneys fees.

On Tue, Jun 14, 2016 at 3:48 PM, Mike Wall <wall@rbmchicago.com> wrote:

John,

Just to be sure, when you referred to "costs" in your email below, did you mean attorneys' fees also? As we discussed in your office on June 6, we are seeking our out of pocket costs *and* the attorney's fees that were incurred.

Mike


Michael J. Wall

Rothschild, Barry & Myers

Suite 3025

150 S. Wacker

Chicago Illinois 60606-4234

312-372-2345

708-275-4845 Cell

This communication is for the exclusive use of addressee and may contain privileged information and/or attorney's work product. If you are not the intended recipient, any use, copying, disclosure, dissemination or distribution is strictly prohibited. If you are not the intended recipient, please notify the sender immediately by return mail, delete this message and destroy all copies.

Thank you.


**From:** John P. DeRose [mailto:john@johnderoselaw.com]
**Sent:** Tuesday, June 14, 2016 3:29 PM
**To:** Mike Wall <wall@rbmchicago.com>

Counsel:

Case costs are not paid by counsel for a party. They are paid to the prevailing party by the party who has not succeeded as long as they are validly incurred and so ordered by the court. As we discussed the other day, you will have to file your motion before the court and we will be given the opportunity to review those costs for which you seek reimbursement, we will determine if those case costs are appropriate or we should file an objection to any or all of them.

On Tue, Jun 14, 2016 at 11:36 AM, Mike Wall <wall@rbmchicago.com> wrote:

Mr. DeRose,

Pursuant to the LR 54.3 I am sending to you copies of the invoices that were sent for payment of the attorneys' fees and costs incurred in the defense of Timothy McCarthy and James Bianchi in the referenced matter. All of these invoices have been paid in full.

As I have advised you, we will be filing motions seeking reimbursement from you and Mr. McGreal for all of these fees and expenses. Please let me know asap if you and/or your client are going to agree to the payment of all, or any of these charges, or if you have any specific objections to any of the entries or the rates charged. When we met in your office on June 6 you said that it was likely that you would hold off on any response until the motions were filed, and then file your responses to those motions. Please let me know if that is still your intention.

The attached do not include the bills incurred by the other defendants in the case and I believe those will be sent to you tomorrow.

Thank you.

Michael J. Wall

Rothschild, Barry & Myers

Suite 3025

150 S. Wacker

Chicago Illinois 60606-4234

312-372-2345

This communication is for the exclusive use of addressee and may contain privileged information and/or attorney's work product. If you are not the intended recipient, any use, copying, disclosure, dissemination or distribution is strictly prohibited. If you are not the intended recipient, please notify the sender immediately by return mail, delete this message and destroy all copies.

Thank you.

--

John P. DeRose
John P. DeRose and Associates
15 Spinning Wheel Road
Suite 428
Hinsdale, Illinois 60521
(630) 920-1111 (phone)
(630) 920-1170 (fax)

**Confidentiality Notice**

The information contained in this EMAIL message is attorney privileged and confidential information intended only for the use of the designated recipient named above. If the reader of this message is not the intended recipient or an employee or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and return the original message to us by regular mail.
Thank you.

--

John P. DeRose
John P. DeRose and Associates
15 Spinning Wheel Road
Suite 428
Hinsdale, Illinois 60521
(630) 920-1111 (phone)
(630) 920-1170 (fax)

**Confidentiality Notice**

The information contained in this EMAIL message is attorney privileged and confidential information intended only for the use of the designated recipient named above. If the reader of this message is not the intended recipient or an employee or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and return the original message to us by regular mail.
Thank you.

# EXHIBIT 2



20 N. Wacker Drive, Ste 1660
Chicago, Illinois 60606-2903
T 312 984 6400  F 312 984 6444

15010 S. Ravinia Avenue, Ste 10
Orland Park, Illinois 60462-5353
T 708 349 3888  F 708 349 1506

www.ktjlaw.com

June 15, 2016

**Via Electronic Mail**
Mr. John P. DeRose
John P. DeRose & Associates
15 Spinning Wheel Drive
Suite 428
Hinsdale, Illinois 60521
john@johnderoselaw.com

    **Re:**   *McGreal v. Village of Orland Park, et al.*, Case no. 12 C 5135

Dear Mr. DeRose:

    Attached please find copies of invoices that were sent for payment of attorney's fees and costs incurred by Klein, Thorpe and Jenkins, Ltd. in its representation of defendants in the above-referenced matter. These invoices are provided to you pursuant to Local Rule 54.3. I would appreciate knowing if you have objections to any of the invoice entries or the rates charged.

                Very truly yours,

                KLEIN, THORPE AND JENKINS, LTD.

                Allen Wall

Attachments

cc:    Michael J. Wall

366242_1

# EXHIBIT 3

LAW OFFICES

## ROTHSCHILD, BARRY & MYERS LLP

A LIMITED LIABILITY PARTNERSHIP
150 S. WACKER DRIVE, SUITE 3025
CHICAGO, ILLINOIS 60606
T: (312) 372-2345
F: (312) 372-2350

Michael J. Wall
wall@rbmchicago.com
Direct No.: (312) 580-3330
Direct Fax: (312) 344-2721

June 15, 2016

**Via Email**
John P. DeRose
John P. DeRose & Associates
15 Spinning Wheel Road, Suite 428
Hinsdale, Illinois 60521

Re:   McGreal v. Village of Orland Park, et al., - 12 C 5135

Dear Mr. DeRose,

This is to confirm our meeting on June 6, 2016 in your office. Attorney John Allen Wall was also present for the Village of Orland Park and Patrick Dugan, as well as your client Joseph McGreal.

Before I discuss the points of the meeting that relate to the defendants' post judgment motions, I will take this opportunity to address the issues that we discussed regarding plaintiff's Motion To Reconsider With Supporting Case Law, which you filed on April 28, 2016 and which was in excess of the page limits allowed by LR 7.1. During our phone conference on June 2, 2016, and again during our meeting on June 6, 2016, you admitted that you served a copy of that motion upon Judge Lefkow without informing any of the defendants of that *ex parte* communication. Each time we discussed this issue you denied that you were required to inform the defendants of that action and you denied that you were required by any rule to serve a notice of presentment with that Motion. At our meeting, I offered to show you the Local Rule that requires that a Notice of Presentment be served with any motion, but you refused to look at the Rule and denied its existence.

Turning to the primary reason for our meeting, we told you that our meeting was required by Local Rule 54.3. You denied that our meeting was required by any rule. Moreover, you told us that no matter what we said and no matter what evidence we gave to you, under no circumstances would you or the plaintiff ever agree that the defendants were entitled to any attorney's fees or costs, from you or the plaintiff for any reason, and neither you nor your client had engaged in any sanctionable conduct.

Despite your adamant position we informed you that we are considering motions seeking sanctions, attorney's fees and costs against you and your client under Rules 11 and 37 of the Federal Rules of Civil Procedure, 28 U.S.C. §1927 and 42 U.S.C. §1988 and we gave you the basis for those motions. We also informed you of our position that your appeal of Judge Lefkow's decisions was frivolous and that we will be seeking sanctions, attorney's fees and costs for that also.

Finally, we told you that despite your adamant position we would be providing to you the information required by the Local Rules, in connection with our motions. You said at the time that you may or may not respond to what we send to you. Subsequently on June 14, 2016, you and I had an exchange of emails in which you informed me that you definitely would not be responding to whatever we sent to you and that you would withhold any response until our motions were filed. Please contact me immediately if you believe that any of the foregoing misstates our communications recited herein.

Michael J. Wall

MJW:ym

cc:   John Allen Wall (by email)
      Lance Malina (by email)
      Alan S. Madans (by email)

# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JOSEPH S. McGREAL,                    )
                                      )
            Plaintiff,                )
                                      )
        vs                            )   NO. 12 CV 05135
                                      )
THE VILLAGE OF ORLAND                 )
PARK, an Illinois                     )
Municipal Corporation                 )
and a body politic, and               )
Chief of Police, TIMOTHY              )
McCARTHY, Individually,               )
and Patrol Commander                  )
THOMAS KENEALY,                       )
Individually, and Police              )
Lieutenant PATRICK                    )
DUGGAN, Individually,                 )
and Police Lieutenant                 )
JOSEPH MITCHELL,                      )
Individually, and                     )
Sergeant ANTHONY                      )
FARRELL, Individually,                )
and Sergeant SCOTT                    )
MALMBORG, Individually,               )
and Lieutenant JAMES                  )
BIANCHI, Individually,                )
                                      )
            Defendants.               )

    The evidence deposition of JOSEPH S.
McGREAL, called by the Defendants for
examination, pursuant to notice, and pursuant to
the rules of Civil Procedure for the District
Courts of the United States, taken before Cynthia
**A. Pavesich, a Notary Public and Certified**

1        THE WITNESS:  The list of items in that

2   Lieutenant -- or Commander Duggan e-mail were

3   related to the first, I think, the first 15

4   charges in the original charging document so the

5   pursuit incident, the accident, the --

6        All of the original charges against me,

7   those were the items that would have proven that

8   they didn't -- so all the items in the e-mail.

9   BY MR. GUISINGER:

10   Q.  Can you identify a specific document though

11   that would have exonerated you?

12   **A.  I don't remember the e-mail -- All the**

13   **items in the e-mail that I'm referring to.  I**

14   **don't remember the exact items.**

15        **It had to do with everything to prove**

16   **that I didn't do what they were accusing me of**

17   **doing.  So it would have been police reports,**

18   **videos, GPS data, phone records.**

19   Q.  Do you know how many documents the Village

20   produced to you in the course of the arbitration

21   proceeding?

22   **A.  A lot.**

23   Q.  I think over 3 or 4,000 documents?

24   **A.  Yes.**

1          important to the membership,

2          the union membership, who

3          received these awards."

4     Do you recall that testimony?

5     **A.** Yes.

6     **Q.** So did you make those FOIA requests

7 specifically to find out about Officer Losurdo's

8 selection as the officer of the year?

9     **A. No.**

10    **Q.** You just happened upon this information in

11 the other documents?

12    **A. I went through thousands of their e-mails,**

13 **and that's some of the information that I found.**

14    **Q.** Again, I'm jumping around because I'm

15 trying to cover some things that we touched on

16 during the last session of the deposition.

17         Do you believe that Chief McCarthy did

18 not have the authority to fire you?

19    **A. Chief McCarthy absolutely did not have the**

20 **authority to fire me without a just cause --**

21 **finding of just cause by either an Arbitrator**

22 **after an arbitration hearing or by the Fire &**

23 **Police Commission.**

24    **Q.** According to what you just said then the

**CYNTHIA A. PAVESICH & ASSOCIATES   (312) 214-1992**

1     MR. DeROSE:  Not only electronic, anything.
2     I've got nothing, guys.
3     MR. GUISINGER:  Just so the record is
4     clear, I'm sorry, Mike, but we did give you 2,000
5     documents.
6         Simply because your client was
7     previously provided the documents doesn't mean
8     that we're not being responsive to your
9     production request.
10        The documents that I provided you were,
11    in fact, responsive to your production request;
12    and the fact that you have seen many of these
13    documents is because of the fact that in the
14    course of the arbitration, Mr. McGreal was
15    provided with over 5,000 documents.
16        The fact that you've seen almost
17    everything is because your client has already
18    been provided almost everything in the
19    arbitration proceeding that lasted 16 days, and
20    there were between 10 and 30 subpoenas that were
21    issued for records that we provided.
22        So I just wanted to make that clear.
23    MR. DeROSE:  All right, I don't want to
24    waste any more time.  I want you to know, guys, I

# EXHIBIT 5

<u>FEDERAL MEDIATION AND CONCILIATION SERVICE</u>

| | |
|---|---|
| In the Matter of Arbitration | ) FMCS CASE     #1000528-57075A |
| | ) GRIEVANCES: 2009-07, 2010-03, 05, & 06 |
| | ) ULP:             #S-CA-10-167 |
| | ) |
| | ) ARBITRATOR:       Dennis Stoia |
| VILLAGE OF ORLAND PARK | ) |
| (Police Department) | ) GRIEVANT:       Joseph McGreal |
| | ) |
| | ) ISSUE:            Discharge |
| and | ) |
| | ) HEARING OPENED:   January 26, 2011 |
| | ) HEARING CLOSED:   March 2, 2012 |
| | ) BRIEFS:          July 6, 2012 |
| METROPOLITAN ALLIANCE | ) |
| POLICE Chapter #159 | ) DECISION:     November 14, 2012 |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

### APPEARANCES

**For the Village**
THOMAS M. MELODY, Esq. (Spokesperson)
JASON A. GUNSLINGER (Assistant Spokesperson)
TIMOTHY McCARTHY (Chief of Police))


**For the Union:**
STEVEN CALCATERRA, Esq. (Spokesperson)
MATTHEW ROESCHLEY, (Assisting)
JOSEPH McGREAL (Grievant)

### STATEMENT

    The parties were unable to satisfactorily adjust certain issues and therefore, submitted the matters to arbitration in accordance with the terms of their contract. Dennis V. Stoia, Emeritus Professor of Industrial Management at Northern Illinois University, opened a hearing of the matter at 10:00 a.m. on January 26, 2011 at the Orland Park Civic Center in Orland Park, Illinois. During the hearing the parties were permitted to present oral, written, recorded and video evidence, to examine and cross-examine witnesses and to make such arguments as deemed pertinent. Witness' were sequestered prior to testifying under an oath. Over the next 14 months, the parties met on 17 days and concluded the hearing on March 2, 2012. During the hearing the parties entered 183 Exhibit's (Joint -15, Village -74, Union -97), applicable [2]*Rules of*

---

[1]Appendix A  -  Exhibit List

[2]Appendix B  -  *Rules of the Fire & Police Commission*

*the Fire & Police Commission,* the [3]*Orland Park Police Department General Orders* and the [4]*Union Agreement.* The Union and the Village agreed that there had been a full and complete hearing of the matter. Due to the unusually large number of hearing days, [5]witnesses, exhibits and issues, the parties and the arbitrator agreed to extend the time for filing briefs and the arbitrator's decision. The parties filed timely written briefs of their arguments and the matter is now properly before this Arbitrator for resolution.

## BACKGROUND

In 2005 the Orland Park Police Department sponsored the grievant, Joseph McGreal, for training at the Chicago Police Academy to become an Orland Park Police Officer. He did very well at the academy and graduated as the class valedictorian and joined the department as a probational employee for on-the-job training to become a patrol officer. His performance during on-the-job training was marginal and so his probation was extended another six months. In 2008, he became a member of the Patrol Union's Executive Committee and was installed as its secretary. He and the new president felt the previous executive committee members were too friendly with the Chief and the Command Staff and believed that private deals had been made which rewarded the executive committee at the expense of the members. The new president asserted that the Chief of Police harbored a Union Animus[6] which was unjustly hurting the patrol officers and he personally was denied a promotion for which he was qualified.

As the MAP 159 Executive Secretary, Ofc. McGreal begin to actively meet with the patrol officers and help them file grievances and assist during discussions of discipline. He informed them of their right to have Union representation (Weingarten Rights), during possible discipline meetings and urged them to assert those rights when questioned by management. In 2009, the Village, like other communities, could see the storm clouds of a financial crises and sought possible cuts to offset the anticipated budget problems. One of the approaches was to seek concessions, such as furloughs, layoffs and early retirements from their various unions. The Patrol Union was not ready to accept concessions and it appeared there might be a reduction of six patrol officer positions. Ofc. McGreal, citing the FOIA act, sought hundreds of village records, including Police Department financial records. Then he prepared and presented at the November 2, 2009 Village Board Meeting the Patrol Union's recommendations, that if followed, could save the six positions.

---

[3]Appendix C  -  Orland Park Police Department General Orders

[4]Appendix D  -  Union Agreement

[5]Appendix E  -  Witness List

[6]. The Chief showed him the qualifications others had ; that he lacked.. Ahrandt testified that Chief had no Union Animus nor would he allow his officers to engage in Union Animus.

-2-

Meanwhile, he continued to press for what he claims to be strictly enforcing the Union contract. Many of the attempts involved his own conduct. In the Fall of 2009, complaints about his conduct came fast and furious. He also sought additional FOIA records concerning specific members of the Command Staff who he believed had created a Hostel Work Environment because among his recommendations to solve the Village's financial problems, he recommend pay cuts and loss of take home vehicles for the Command Staff. Basically, the Village did not adopt his suggested alternatives, but did cut one position from the force. One officer was laid-off, but was rehired six months later when another officer resigned and the cut position has not been restored. Soon after he tried and failed to get one of his personal problems settled at the shift level, he filed grievance 2009-07 on December 18, 2009, claiming a hostel working environment.

During fall of 2009, Ofc. McGreal was cited for over 50 separate rule violations, including direct and intentional insubordination and lying to supervisors. On November 9, 2009, McGreal notified the Human Relations Department that he was being subjected to a Hostile Work Environment. On December 9, 2009 Human Relations Director Przybyski[7], Village Manager Grimes, and Assistant Village Manager Baer met with MAP Attorney Mazzone and Ofc. McGreal to hear his Hostile Work Environment claim. Between 12/14/2009 and 2/4/2010 HR Director Przybyski and Assistant Village Manager Baer interviewed the ten supervisors who McGreal claimed had created the hostel work environment in the 12/9/09 meeting as well as the situations added in a second document from McGreal on 1/5/2010. HR Director Przybyski summarized their investigation on 2/2/10 in a 6-page report to Village Manager Grimes. It contained a summary of each of the fifteen situations which McGreal claimed were hostel. They reported:

> *The supervisory responses in the situations described within this complaint were appropriate based on the conduct of Officer McGreal during these incidents. Decisions to examine Officer McGreal's behavior were not made as a result of his filing FOIA's or his affiliation with the union but were a direct result of their knowledge of Officer McGreal's conduct.*

Meanwhile, On November 11, 2009, Chief McCarthy ordered an internal investigation concerning Ofc. McGreal's conduct. It was scheduled for December 21, 2009, but at Ofc. McGreal's request, was postponed until January 21, 2010. On December 24, 2009 MAP, on McGreal's behalf, filed a Unfair Labor Practice (ULP) charge with the Illinois Labor Relations Board (ILRB). On May 11, 2009, the ILRB asked for specificity. On January 21, 2010 Cmdr. Duggan conducted an internal investigation of the complaints about McGreal's performance as a police officer. When Chief McCarthy learned that MAP had filed an Unfair Labor Practice (ULP) with the ILRB, he turned the matter over to the Director of Human Resources to independently investigate and determine if McGreal's problems were the result of union animus. On February 22, 2010, Ofc. McGreal's personal vehicle was involved in a hit and run accident.

---

[7]. A well educated, experienced, nationally recognized Human Relations Professional.

On March 5, 2010, Ofc. McGreal was placed on Administrative Leave due to the ongoing internal investigation concerning the hit and run accident. On March 24, 2010 Cmdr. Duggan conducted an internal investigation of the February 22, 2010 Hit and Run.

Based on Cmdr. Duggan's internal investigations and the findings of the Human Relations Department, on April 28, 2010, Cmdr. Kenealy conducted a Pre-Disciplinary Meeting with Ofc. McGreal and his attorney concerning the various charges and possible discipline. On June 4, 2010 Chief McCarthy citing 26 charges asked the Police and Fire Commission to terminate Ofc. McGreal. On June 8, 2010 MAP amended and refilled their claim of a Unfair Labor Practice . McGreal filed grievance 2010-6 claiming Cmdr. Kenealy's Pre-Disciplinary Hearing did not meet the union contract's specifications. Chief McCarthy denied the grievance on June 16, 2010 . The Police and Fire Commission set June 28, 2010 as the hearing date and on June 25, Ofc. McGreal elected, as permitted in the Agreement, to have his fate determined by arbitration. On July 22, 2010 the ILRB deferred McGreal's complaint charges to the contractually specified arbitration. The parties agreed that resolution of grievance 2010-06 will automatically resolve Grievances 2009-06, 2010-03 & 2010-05 as they all relate to McGreal's claim of a hostile work place and validity of the April 28, 2010 Pre-Disciplinary Hearing

On September 29, 2010, the Village, thru this arbitrator sought and obtained a subpoena to acquire Ofc. McGreal's AT&T cell phone records for the month of February and March 2010. On October 12, Mrs Sheila McGreal (Joseph's Mother) filed a Motion to Quash the AT&T Subpoena claiming the phone was registered in her name. The Village had already received the records on October 22nd and on November 2nd the Union joined Sheila McGreal's Motion to Quash the AT& T Subpoena. Still prior to the scheduled January 26, 2011 meeting several other related motions were filed by the parties. At the January 26th and February 8th arbitration hearings, the parties offered oral argument for their respective positions concerning admission of the cell phone records. On February 12, 2011, this arbitrator[8] denied the quash related motions and allowed the cell phone records to come into the hearing

The Arbitrator finds the issues to be:

    1. Did the Village fulfill the requirements of a Pre-Disciplinary Hearing before terminating Officer McGreal? If not. what is the remedy:

    2. If so, did his superiors discipline Officer McGreal more severely than other Officers in like situations? If so, what is the remedy?

    3. If not, did the Village have Just Cause to discharge Officer Joseph McGreal on June 16, 2010? If so, what is the remedy?

    4. Was there Union Animus ? If so, what is the remedy?

---

    [8] Appendix E - Arbitrator's Decision on Motion to Quash .

## DISCUSSION AND DECISIONS

### GRIEVANCE #2010-03  Bike  Patrol  Complaint

Officer McGreal filed Step One Grievance #10-03 on 1/9/10 when he saw an e-mail reporting that he was seen going to a movie while he was on sick leave. This matter is  "Charge 9" of the Village's Dismissal Charges and will be discussed there.

### GRIEVANCE #10-05 - 4/28/10  Pre-disciplinary  Meeting

Officer McGreal filed Step One Grievance #10-05 on 5/5/10. It was denied on 5/5/10. McGreal moved it to Step Two  on 5/13/10. A Step Two meeting was held on 6/6/10 and confirmed in writing on 6/9/10. McGreal attempted to move it to Step Three but failed to make a timely delivery of it to the proper place. The parties agreed that the substance of this grievance is contained in the Village's Dismissal Charges.

### GRIEVANCE #10-06:  Dismissal Charges

Officer McGreal filed  Step One Grievance #10-06 on 6/10/10 claiming the Charges against him based on the investigations are without merit. It was denied on 6/16/10. He elected to have his case arbitrated instead of a hearing before the Fire and Police Commission. The parties agreed that resolution of this grievance will also resolve the other grievances stated above.

### CHARGE 1:  October 27, 2009  Traffic  Stop

In accordance with OPPD General Order 61.8.8 B, as part of his normal duty watch, Sgt. Farrell reviews at least one random audio/video traffic stop each day. On October 28th or 29,[th] he reviewed an October 27, 2009 traffic stop by Ofc. McGreal and became concerned because someone was placed under DUI arrest, the audio was turned off and the subject  placed in the patrol car. About 5 minutes later, Ofc. McGreal made a 2 minute search of the front seat and trunk but not the back seat.   A few minutes later, alone the uncuffed subject  returned to his vehicle. And 8 minutes later Ofc. McGreal appeared and handed the subject written warnings and explained what he needed to correct.

Sgt. Farrell knew a cuff and release needed an explanation. Further he felt the conversation between Ofc. McGreal and the suspect after release at the suspect's car was leading . He informed Sgt. Malmborg, Ofc. McGreal's supervisor of the cuff and release auto/video. Upon watching the audio/video, Sgt Malmborg also became concerned because the person taken into custody (cuffed) and then released without a general case report of what transpired .  He

-5-

discussed the matter with his supervisor, Lt. Mitchell. They were particularly concerned about what occurred in the 18 minutes of no audio between the cuffing and release. Further, McGreal had not filed the required General Case Report for a DUI which could explain this traffic stop.

### Village's Position

Lt. Mitchell and Sgt. Malmborg met with Ofc. McGreal and showed him the audio/video. After watching the video, he was asked to explain what happened and his response was that he has made hundreds of traffic stops and had no recollection of this particular stop. He claimed his daily incident report covered the reporting requirements and that cuff and release is a common practice which did not need further review.

The Village contends the audio/video did not reveal a probable cause for arrest because after the subject refused to take a Breathalyzer test no alternate field sobriety tests were administered. The Village asserts that Ofc. McGreal **violated General Order 61.8.3** when he did not fully record the Traffic Stop. He also **violated General Order 61.8.4(G)** as he ceased the audio recording before the incident was complete as it was not stopped at a logical point; nor did he provide a memo to document why Mr. Robson was cuffed and then released. In addition he **violated General Order 61.8.5(B)** as he did not "Bookmark" the traffic stop.

### Union's Position

The Union contends that the one month delay between the October 27th event and the meeting with Lt. Mitchell and Sgt. Malmborg, made it difficult to remember what transpired on any particular traffic stop. More important is that the long delay shows that he is being targeted because of his Union Activity and all his available past recordings must have been searched to find one to take issue with. Further, arrest and release, while not frequent, does happen; he and other officers testified of other specific instances where no report was rendered or required.

### Decision

Audio/Video's are used as evidence when contested in court which is probably more than a month after the arrest. It is not unreasonable to expect the arresting officer to recall the event after seeing and hearing its audio/video. It is simply not believable that he could not remember the October 27th arrest as a "cuff and release" is a rather unusual event. Perhaps, there was an acceptable reason for what transpired, but Ofc. McGreal did not choose to provide it.

Therefore, Charge #1 is upheld and the Grievant is subject to disciplinary action.

### CHARGE 2: November 27, 2009 General Case Report

Since there was not a General Case Report, Lt. Mitchell asked Ofc. McGreal to prepare one. They allowed him, together with Ofc. Ahrandt the Union President as his Representative, to review the audio/video and allowed him three hours to prepare the report. After three hours,

instead of completing and delivering a report, Ofc. McGreal claimed that the incident report on file fullfilled the reporting requirement and declared that Lt. Mitchell was making a wrongful interpretation of the General Order. Lt. Mitchell again ordered him to complete a General Case Report and Ofc. McGreal merely cut & pasted the incident report onto a General Case Report form. It did not provide the information required nor did it meet the required syntax standards. On the third attempt, after some revisions, it was still deemed as deficient, but accepted.

### Village's Position

First, the Village maintains that Ofc. McGreal **violated General Order 82.2.2B** when did not prepare a General Case Report or a written report after arresting and taking a person into custody for DUI. Ofc. McGreal's own wetness's testified that at least since December 2008, that the policy was that whenever someone was taken into custody or put in handcuffs, the officer had to write a case report. The Village contends that Ofc. McGreal **violated General Order 26.2.2(A7)** when he failed to promptly perform lawful duties when did not promptly deliver a proper report . He **violated General Order 26.2.2(J)** as he was less than truthful and cooperative when preparing and delivering the required General Case Report. Additionally, **violated General Order 26.2.2(F)** as he was untruthful when he testified before this arbitrator that Lt. Mitchell and Sgt. Malmborg lied when they testified that they had ordered him to write a General Case report. Village Exhibit #9 is entitled "Direct Order for General Case Report" is a memo written by Ofc. McGreal's and belies his claim that he was never ordered to prepare a General Case Report.

### Union's Position

The Union strongly contends that is another example of Lt. Mitchell, in particular, is seeking ways to punish Ofc. McGreal for actively seeking compliance with the contract. Ofc. McGreal obtained FOIA documents and presented to the Village Board some cost reduction possibilities which included lowering command staff wages, take home vehicles and discontinuing the practice of re-hiring retirees. Further, Ofc. McGreal contends that un-arresting a prisoner is required if further information shows there was not sufficient cause for the arrest, but a General Report is not expected. Ofc. McGreal asserts that although he did complete a General Report, he was never actually ordered to do so.

### Decision

The General Orders clearly require some documentation beyond the incident report for all DUI arrests. Claiming he doesn't remember this particular and unusual arrest of someone he knew is untruthful and uncooperative. Ofc. McGreal's contention that the incident report satisfies the requirement is without merit as his superior ordered him to prepare a General Case Report and gave him sufficient time and resources to do so. Arguing with his superior about the meaning and intent of the General Order is a clear demonstration of being uncooperative. Not only in para-military organizations, but also in business organizations; unless performing the

order will cause physical harm, comply. Apparently, Ofc. McGreal didn't want others to know the reason he "cuffed and released" the subject . His inconsistent testimony during several interrogations and this hearing, still does not provide an answer as to what went on during the 18 minutes the MIC was off.

Of major concern about McGreal's testimony is his lack of respect for the truth. For example, Village Exhibit #9 is a memo written by Ofc. McGreal and is entitled *"Direct Order for General Case Report."* which clearly belies his claim that Sgt.. Malmborg and Lt. Mitchell were lying when they testified he was ordered to complete the General Case Report.

Therefore, Charge #2 is upheld and the Grievant is subject to disciplinary action.

## CHARGE 3: November 7, Alsip Pursuit

On November 7, 2009, a pursuit started in Alsip and headed into Orland Park westbound on 167th Street. Ofc. McGreal was working in Beat 5 and heard of the pursuit and without seeking permission headed on 159th Street toward 151st and Wolf Road. He paralleled the pursuit assigned to Officers Sanders and Bush by Sgt. Malmborg. Sgt. Malmborg spotted an unexpected police car, Ofc. McGreal's, leaving 151st and Wolf Road which was outside of his beat and McGreal had evidently self-assigned himself to the pursuit. Upon review of the in-car video, Village Exhibit #24 shows that without activating emergency lights or siren Ofc. McGreal left his beat assignment, drove at 80 miles per hour and crossed double yellow lines at 74 miles per hour while engaged in his self-assigned and unreported participation in the Alsip pursuit.

### Village's Position

First, the Village holds that Ofc.. McGreal **violated General Order 41.5.10(A)** when he became involved in this Intra Jurisdictional Pursuit without approval of a supervisor and **violated General Order 26.2.2(A17)** as he left his beat without permission of his immediate supervisor or Shift Commander. Of major concern is that a review of the in-car video (Village Exhibit #24) shows the he drove dangerously and recklessly, at speeds well over the speed limit, crossing double yellow lines, without activating emergency lights or siren and thus endangering himself and the public while engaged in his unauthorized pursuit. He **violated General Order 26.2.4(F)** when he self-assigned to the pursuit and failed to report it to Sgt. Malmborg or the Chief of Police. The next day, Sgt. Malmborg spoke to Ofc. McGreal and informed him that the incident was not going to happen again.

### Union's Position

First, the Union contends that he was well within Illinois law when he traveled over the posted speed. He was driving a fully marked police squad car while responding to an emergency; so audible or visual signals are not required. Further, he was responding as he was been trained to do which is *"when a big emergency comes up not to clog up the radio with information such*

*as (going to the scene - just go to the scene)."* In accordance with General Order 41.2.3(c)(4) officers are required to use their judgment based upon the facts that they know to choose the appropriate response. From what he heard on the police radio he believed lives were at risk and he choose the Code 3 response was appropriate. In response to a Code 3 emergency he left his beat and traveled parallel to the pursuit but did not join it as he went to cover the intersection of 141st and Wolf Road which is in the path of the pursuit. To not respond would have been neglect of duty. At the conclusion of the pursuit, Ofc. McGreal asserts he reported his self assignment to Sgt. Malmborg. The GPS system takes periodic, not continuous pictures, so his brief stop while reporting to Sgt. Malmborg that night was not recorded.

As testified by fellow officers, speeding with or without activating warning lights and sirens, depends on the situation and not at all unusual. Finally, the record shows that in order to prevent future problems of this type, Sgt. Malmborg counseled Ofc. McGreal which is the first step in the disciplinary process. As a further example of the hostile work environment, Sgt. Malmborg's superiors choose to move the event up for additional discipline.

<u>Decision</u>

The Village has clearly demonstrated that Ofc. McGreal had violated at least three General Orders, it was not the accepted general practice . Fellow patrol testified that they too had exceeded posted speed limits etc. in the normal performance of their assignments . However, a self-assignment to other actions would be promptly reported to their supervisors. Under certain circumstances it occurs and as soon as possible reported by the officer to their supervisor . Ofc. McGreal did not report the occurrence as mandated. At the end of the pursuit, Sgt. Malmborg saw McGreal leaving without reporting his actions to him. Sgt. Malmborg called him in to find out why he had self-assigned himself to the pursuit. At that meeting, he warned Ofc. McGreal that *"it had better not happen again."* Ofc. McGreal had the right to believe that the matter was settled as he accepted the verbal warning. Apparently, Sgt. Malmborg's superior thought the incident deserved a stronger message . Too late as Ofc. McGreal 's penalty was already be completed

Charge #3 is denied. Verbal warning counseling is the 1st step in discipline.

<u>CHARGE 4: November 9, 2009 Forest Preserve Incident</u>

On November 9, 2009, Mr. Robson, the "cuff & uncuff" citizen in the October 27, 2009 Traffic Stop, had come to the police station turn himself in on an arrest by Ofc. McGreal. He was only at the station for about ten minutes when the call came for McGreal to join the search for three Tinley Park burglars who crashed their van and had run into the Forest Preserve. When Ofc. Arhant arrived, Lt. Mitchell told him to relieve Ofc. McGreal so he could go back to complete paperwork for Robson's arrest and incarceration. When McGreal was replaced by Ofc. Arhant, he went to Lt. Mitchell and demanded to know why he was being removed. He

-9-

was told he needed to complete Robson's paper work and Ofc. McGreal became angry and said it was complete. Lt. Mitchell disagreed as he was at the station when Ofc. McGreal was working on the Robson case and Lt. Mitchell had told Ofc. McGreal that since it was a domestic violence case Robson could not be released . This meant placing him in custody for the night for a bond hearing in the morning and more paperwork than the ten minutes Ofc. McGreal had worked on it before being called to the Forest Preserve.

Lt. Mitchell told him to clear the Forest Preserve call and go back to the station to finish the paper work, and then go back to his beat.. Ofc. McGreal drove to the station at speeds up to 71 mph without using his lights or siren even though there was no emergency. He spent not more than 12 minutes at the station and then raced to the forest preserve at excessive speed up to 94 mph and went through a red light, without using his lights and siren; and at one point nearly hit a car going through on a green light. Ofc. McGreal reported that he had completed the arrest paper work and Lt. Mitchell told him to clear the call and go back to his beat. Shortly after that Lt. Mitchell observed McGreal driving on the bike trail in the forest preserve which was not McGreal's beat assignment. Lt. Mitchell ordered McGreal back to the station and showed the still incomplete paperwork to him and his Union Representative - President Ahrendt.

### Village's Position

The Village maintains that the police force has a duty to understand and comply with orders as documented in **General Order 26.2.1(H)** and McGreal **violated** that order when he did not properly prepare Robson's arrest forms even after being shown what needed to be done. After being removed from the forest preserve call he met with Lt. Mitchell and wasn't truthful so he **violated General Order 26.2.2 (F)** when he said the Robson paper work was complete when it wasn't and again **violated General Order 26.2.2 (F)** by reporting that he had made the corrections and was ready to go back on the forest preserve call. Lt. Mitchell was certain the report was not properly prepared as he personally knew that McGreal had spent only 10-15 minutes on the Robson arrest and another 12 minutes in the station when he returned to make the corrections. Lt. Mitchell was right and an examination of the papers shows the serious errors.

The Village further points out that McGreal **violated General Order 26.2.2(J)** as he was not truthful or cooperative in the "removal from the forest preserve call" discussion with Lt. Mitchell. Getting angry and making false claims cannot be tolerated. There was no emergency for him to speed to and from the station so he **violated General Order 41.2.** Lastly he **violated General Order 26.2.4(F)** when he failed to return to his beat and instead self assigned himself to a police action when he entered the forest preserve and drove onto the bike path.

### Union's Position

First, the Union asserts that McGreal was driving a fully marked police vehicle to an emergency, so he was authorized to exceed speed limits without activating the warning lights and siren. The GPS data from that evening shows that Officers Berthold, Bush and Ahrendt as well

-10-

as supervisors Mitchell and Farrell also exceeded the posted limits while driving to the forest preserve. Like the others, McGreal was performing his job as they were all trained. Yet, not one of them was punished or even questioned which is another example of the hostel work environment.

Next, when McGreal left the station, the Robson arrest was complete as he had arrested him, placed him in handcuffs and taken him to lockup. He turned the paperwork into the dispatchers, who checked it for completion and then went back on the street. Thus, he was truthful when he told Sgt. Mitchell that paperwork was complete as any minor errors would be corrected by the dispatcher who reviewed it. Again, an example of singling McGreal out for punishment.

### Decision

The first trip he made from the police station while answering his call to the Forest Preserve was an emergency and he was justified in speeding to it. However, the GPS video was for the 2nd trip and that record shows that McGreal treated, the over the speed limits on the trip back to the station, as an emergency; which is probably an expression of his anger for having been removed from his forest preserve assignment. That might be forgivable, but after finalizing the paper work, there was no justification for speeding to make a coffee run.

In this hearing's testimony, McGreal claimed that after he made the minor revisions to Robson's arrest papers, he went out on the street and reported that he was available for assignment. In his testimony, he claimed that Lt. Mitchell never told him to clear the call which would entitle him to speed back to the forest preserve. If he hadn't been told to clear the call then he would not have punched in 10/8 and gone on a coffee run. He wrapped up the Robson arrest as if he was still on call and sped to the forest preserve. However, when Lt. Mitchell saw him on the bike path he needed an excuse. When "never told to clear the call" wasn't going to work , he tried a new story. Which was - He then headed towards his beat which is adjacent to the forest preserve and to make a coffee run for officers on the perimeter. While there he saw his backup (Berthold) on the bike trail without a backup and he drove onto the bike trail to back him up. At all times, he was minutes away from his beat 3 if called. However, this is a good story but not the one he told in any of his previous testimonies. Another example of his inconsistent testimony geared to get him off the hook.

Therefore, Charge #4 is upheld and the Grievant is subject to disciplinary action.

### CHARGE 5: November 24, 2009 Awards Night

Each year the department selects an "Officer the Year" whom they name and recognize at a public awards night. Awards night was in the Sandburg High School with about 1000 people present including approximately 120 police department employees . About a week before the public ceremony, the word slipped out that Officer Losardo was going be the recipient. This

bothered Ofc.. McGreal as he and Losardo never had a good relationship. At one point they went face to face and were yelling at each other. After Lt. Guerra stopped the yelling, she took McGreal to task for bulling Losardo and from that day forward, he referred to her as a "rat" and never spoke to her again.

Ofc. McGreal made it known, to more than a few fellow officers, that if Losardo was named "Officer of the Year " he would walk out of the ceremony. One of them told Cmdr. Kenealy that McGreal was going to stage some kind of stunt or event to disrupt the ceremony if Ofc. Losardo got the award. Ofc. Losurdo received the Award and as he was presented with it, McGreal got up and walked out of the ceremony. Aware that this might happen, Cmdr. Kenealy stationed himself in the lobby and confronted McGreal when he arrived. McGreal as he rubbed his stomach, conveyed to Cmdr. Kenealy that he had an upset stomach and needed use the restroom. However he did not appear to be sick as a little later he was drinking coffee, laughing and talking with other officers.

### Village's Position

The Village points out that once again, McGreal makes up new excuses as he goes along. He indicated to Cmdr. Kenealy that he didn't feel well. He then claimed that after the restroom stop, he was fine and even reported for work that night. Later he claimed that on the week of the awards ceremony, he was so visibly sick that everyone knew it. In the January interrogation, he said he was not sick which meant he was not going to throw up. At this hearing, he claimed he was in "extreme pain" as he has diverticulitis - an inflammation of the large intestine that causes extreme pain in the abdomen. Yet, in all his interrogations he never offered a witness to support this claim. He **violated General Order 26.2.2(F)** when he provided conflicting reasons for leaving the award ceremony.

At this hearing, he testified that he did not tell anyone in advance that he was going to walk out of the ceremony and that it was not a predetermined decision. He claimed he was not trying to engage in a protected concert activity or make a statement to management. And in his hostile environment complaint and Grievance 2010-06 he wrote the he was unaware of any officer being upset that Losardo got the award. While he was in attendance three of his own witnesses, testified that he had told them in advance that he was going to walk out if Losardo got the award. Confronted with the fact that three fellow officers testified that they were aware of his plan to walk if Losardo got it, his response was that all three of them lied. He never explained how Cmdr. Kenealy knew in advance and expected to see him walk out. He **violated General Order 26.2.2 (J)** as it was not just a coincidence that he needed to go the men's room at same time that Losardo got the award.

### Decision

McGreal claims that walking out of the ceremony was not planned in advance. Yet, Cmdr. Kenealy and Ofc. Kovic knew in advance that McGreal was going to publicly protest if

Losardo was named Office of the Year. They knew that not because they had psychic powers, but because McGreal told Kovic and asked him to be a participant. This arbitrator understands that there is a unwritten practice that one union brother doesn't squeal on another. In the first round of questioning his fellow officers tried to cover up for their Union brother as well as their own participation. Later when they testified under oath, they recanted and just received minor discipline. McGreal chose to continue denial and fashion various excuses to support his action. His fellow officers had tried to help him and in return he chose to call them liars. The record clearly shows that he, not them, was the liar.

There is no doubt that Ofc. McGreal had planned to do something, perhaps even greater than walking out, if Losardo was named Ofc. of the Year. There was no love lost between them. It was obvious that he didn't like Losardo. Seeing your rival get an award, which you believed was yours, might even inflame the large intestine and cause abdominal pain, but it doesn't justify action against him. McGreal's complaint should have been focused on the selection committee, not the award recipient and he denied that he was trying to send a message to management.

Charge #5 is upheld. He was not truthful, while under an oath, in the investigations as well as at this hearing. Therefore, he is subject to discipline up to and including discharge.

### CHARGE 6: November 24, 2009 Roll Call

At the roll call for the midnight shift on November 24, 2009, the same night that Ofc. Losurdo had received the Officer of the Year Award and Ofc. McGreal had walked out of the award ceremony. Ofc. McGreal and others ostracized Ofc. Losurdo by not siting in their usual seats, turning their backs toward him and refusing to sit by or near him. When questioned about this by Sgt. Farrell, Slewoski refused to answer, Berthold denied attempting to exclude Losardo and McGreal stated that there is not a required seating chart and that he could sit wherever he wanted. Having seeing what happened at the awards ceremony earlier that night, Sgt. Farrell was afraid that the shunning of Ofc. Losardo might follow into the street which could be a serious safety problem. He called and woke Cmdr. Kenealy in the middle of the night to inform him that the ostracizing of Losardo had continued onto roll call. Sgt. Farrell documented this incident for his superiors,. After further interrogation, Cmdr. Kenealy concluded that Ofc. McGreal was the ring leader and orchestrator of this incident and should be disciplined for "unbecoming conduct."

### Village's Position

The Village asserts that shunning a fellow officer is a very serious problem and cannot be tolerated in police work where the officers frequently depend on each other. Shunning a fellow officer is an unbecoming act which discredits the department- a **violation of General Order 27.2.2 (G)**. While McGreal, without proof, denied that he had planned the award ceremony walkout, he took a "so what" attitude when questioned about the shunning of Office Losurdo at the roll call. He was very cocky, arrogant and sarcastic and stated that he could sit wherever he

wanted as seats were not assigned. This pattern of insubordination and disrespect for his superiors and the chain of command is typical for him. Sgt. Farrell illustrated an example of this cocky disrespectful attitude when he testified and Lt. Guerra confirmed the following:

> When Lt. Guerra first started running the midnight shift, she knew there were some issues with some of the team members, with Officer McGreal, not getting along. And we had called in the team members one at a time to talk to them and tell them this is going to be a team effort; we're going to work as a team; explain things to them. And during that meeting with Officer Joe McGreal, he told us during that meeting that - he runs the midnight shift and that the officers do what he tells them to do and that if we - if we want something done, it goes through him, the guys listen to him, he runs the shift. (Farrell Tr Vol. 2, pg 257-8, Guerra, Tr. "Vol. 4, pg 628.)

Ofc. McGreal had been warned several times about his disrespectful attitude when dealing with his superiors. A **violation of General Order 26.2.2(E)**.

<u>Union's Position</u>

During the roll call no one said anything out loud to disrupt the roll call. Other than sitting in different seats, there were no other physical acts that interfered with Sgt. Farrell's ability to conduct roll call. There were no incidents during the shift. Everything about the shift was normal except four individuals who did not sit where they normally do. No policy or order was violated by sitting in a different seat at roll call. You sit where you choose and can vary for many reasons, such as Ofc. Ahrendt's desire to be near the free cake that night. Ofc. McGreal did not say anything negative to Ofc. Losurdo during the roll call. There no indication that Ofc. Losurdo felt uncomfortable or being ostracized. This was a silent protest officers as a lot of the officers felt Ofc. Losurdo didn't deserve the award as they believe that he acts in an unsafe manner as a police officer.

Ofc. Berthold described it as *"just three guys being stupid."* Just before the roll call, Officers Berthold, McGreal and Slewoski were making wise cracks about switching seats at roll call. They were being immature and thought it would be funny to move over to the other side of the room to be away from Ofc. Losurdo. It was a statement that they did not agree with his selection as Officer of the Year. For not being forthcoming with information and untruthful, short suspensions were given to Ofc. Berthold (5 days) and Ofc. Slewoski (2 days). Ofc. McGreal was not charged for being untruthful or lying about the roll call incident, yet the Village is seeking termination for Ofc. McGreal.

<u>Decision</u>

The Union goes to great lengths to show no damage was done. The roll call was completed without problems, the shift was normal, all calls were well handled etc. and Ofc. Losurdo did not complain, They were just letting him know through humor that fellow officers who work with him did not feel that he deserved the award. They were wrong as it was not just

-14-

changing seats, they seated themselves away from and turned their back to him. They may have thought it was funny, but it was not. Shunning is too strong of a message as it is saying we don't want to have any thing to do with you. In police work, you depend on the support of your fellow officers and shunning clearly sends the message that you can't.

The Union seems to agree that Ofc.'s Berthold and Slewoski were properly punished with short suspensions for being untruthful regarding the roll call incident. And the Village is now seeking termination for Ofc. McGreal! There is a distinct difference as Ofc. McGreal was untruthful when questioned that night and had organized and put in place the plan to shun Ofc. Losardo. He merely said since seats are not assigned, he could sit wherever he chose. However, there was reason to believe that Ofc. McGreal had orchestrated the shunning and they needed more time to investigate and prove it. From the testimony, it appears that McGreal tried but failed to recruit others to join him by walking out of the awards ceremony. Just before the roll call, he managed to find a couple of officers to join him in ostracizing Ofc. Losurdo.

Charge #6 is upheld and the Grievant is subject to disciplinary action up to and including discharge as he falsely testified while under an oath..

## CHARGE 7: November 27, 2009 Sick Call

On November 26, 2009 Ofc. McGreal requested a shift trade so that he could be off work for the November 28, 2009 shift (which begin at 10:35 p.m. on November 27). This shift trade request was denied in part because November 28, 2009 was the Friday after Thanksgiving, which was certain to be particularly busy. Furthermore, Ofc. McGreal's shift trade request was unusual due to the fact the shift trade was with another officer who was already scheduled to work that same day and so if he worked another shift if would be double time. After the shift trade was denied, Ofc. McGreal was angry and personally asked Lt. Mitchell to ignore the normal minimum manning requirements so he could be off. Ofc. McGreal had a wedding that he wanted to attend, though he did not share this fact with his supervisor. At approximately 7:15 p.m. on November 27, 2009, Ofc. McGreal called in sick for November 28, 2009 shift. Ofc. McGreal attended the wedding which took place at the Double Tree Hotel in Alsip which is nearby.

Lt. Mitchell suspected that Ofc. McGreal might call in sick for this shift, as he had been denied the shift trade, seemed anxious to get the night off, and accordingly left an order that if Ofc. McGreal called in sick he was to be ordered to go to the doctor immediately. When Ofc. McGreal called in sick on his shift, Sgt. Siewert ordered him to immediately go to the doctor and recorded the conversation. Ofc. McGreal said that he planned to go to the doctor the next day, but Sgt. Siewert told him he was to go to the doctor that night not the next day.

Ofc. McGreal was ordered to bring in a doctor's note stating the date and time he went to the doctor. Ofc. McGreal didn't comply with the order as he brought in a doctor's note dated November 16, 2009 which is 11 days before the absence and did not state the time of his visit.

-15-

Ofc. McGreal was again ordered to obtain and submit a doctor's note showing the date and time he went to the doctor. Ofc. McGreal didn't fully comply with this order as he brought in a second doctor's note that again did not state the time he sought treatment.

Ofc. McGreal put in for (2) hours of overtime for going to the doctor and two (2) hours for getting the doctor's note, for a total of four (4) hours overtime. He failed to indicate on his time sheet the time he actually spent on these purported activities. Cmdr. Kenealy directed Ofc. McGreal to fill in his time sheet properly, indicating the time he claimed entitlement to overtime. Ofc. McGreal didn't submit any specific time as directed. Ofc. McGreal did not spend four (4) hours going to the doctor or getting the doctor's notes and was subsequently paid eight (8) hours sick pay, but not any overtime as he never properly completed his time sheet for overtime.

### Village's Position

Ofc. McGreal received and understood the order to see the doctor immediately, but went the next day some 20 hours later. This is a <u>**violation of General Orders 26..2(D), 26.2.2.(H) and General Order 26.2.2(A7).**</u> McGreal claimed during a subsequent interrogation, that he became ill; (flu symptoms) and left the wedding. He went home to change before going to the doctor and for the flu symptoms took some Nyquil which meant he couldn't drive. He never bothered to call back to report his inability to drive. However a few days later he filed his hostile environment complaint and stated that he had been "visibly sick for over a week" and repeated his "visibly sick for over a week" claim in grievance 2010- 06. Yet, under an oath, he testified that was not sick at the awards ceremony which was just three days before the wedding. He violated **General Order 26.2.2(J)** (The Nyquil story and inability to drive was first told in January 2010.) Thus he **violated General Orders 26.2.2(F) &(J) and General Order 26.2.3(L)** .

Finally, McGreal put in for four hours of overtime pay, two for each trip to the doctor. He could have just called the doctor and gotten the slip. Apparently, McGreal didn't want to disclose the time of day when he saw the doctor as he knew it would show he had not complied with the order to go immediately. Comdr. Kenealy wrote McGreal a memo directing McGreal to provide the specific hours he went to the doctor and to explain how he believed he was entitled to overtime when he was already being paid sick time. Rather then provide as requested he wrote this sarcastic reply -"*Also, would be glad to come in and speak to you at any time regarding the collective bargaining requirements of overtime pay.*" Cmdr. Kenealy wrote another memo directing McGreal to provide the hours. McGreal never did provide the hours. Thus, he **violated General Order 26.2.3©.**

### Union's Position

The Union contends the well established past practice is that seeing a doctor and bringing in doctor's note to verify illness is not required. This was confirmed by both Village and Union witnesses. If management wanted to start enforcing the requirement, they should have informed

the employees and at least told Ofc. McGreal and warned him of the consequences . He intended to go the doctor after the wedding, but sometime that evening, Illness forced him to leave the wedding early and he went home to change clothes before seeing the doctor. . To combat the flu he took Nyquil and then realized that he shouldn't drive, so he laid down and fell asleep. When he awoke, he was still ill so the doctor could and did certify the illness.

He was sick that night and there is no policy that forbid s him from attending a wedding before his shift, nor was there evidence that he was at the wedding or other than home during his shift time. Office McGreal is the first and only officer who has ever had a "standing order" that when he is sick he must see a doctor immediately to have it verified. Truly, another example of Lt. Mitchell's personnel vendetta to punish McGreal and *"get his ass fired."*.

### Decision

Ofc. McGreal, as MAP 159's Executive Secretary must have known the contractual agreement (Article X – Sick Leave) that in Section 10.5 says:

*The Village may, at its discretion, require an employee utilizing sick leave to submit during such leave to an examination by a doctor or nurses designated by the Village, at the Village's expenses.* ...

While its true that they seldom require a doctor's note to confirm sickness. They clearly have the right to do so. No need to waste money on a medical examination if they believe the person is actually sick. Lt. Mitchell had reason to suspect that McGreal was not sick as McGreal did not appear sick when he unsuccessfully pleaded to be absent on his November 28 shift (Black Friday) and had a history of abusing sick leave. Further, Sgt. Siewert's tape recording of his order (Village Exhibit #17) does not indicate this was a standing order as claimed by the Union, it was just for that particular night.

The record of the phone call documented that McGreal was to immediately see the doctor. Since McGreal received the call on his cell phone, he may well have been at the wedding and intended to leave after the wedding reception to see the doctor. Rumor has it that after the wedding , he didn't return home that night. Be that as it may, he didn't get to the doctor until 4:00 pm on November 28th and whether it as intentional or not, he failed to carry out the order in a timely manner. The Nyquil story may have provided him with acceptable excuse for waiting for 20 hours; if he had offered it in the beginning. Also Nyquil does not forbid operating a motor vehicle, it just says to use caution and there doesn't seem to be a valid reason for changing clothes before going to the doctor.

His claim for overtime pay is not valid. Article 13 Section 13. (Call Out) only applies to "called to work" which he was not. According to Article 10 Section 10a (Sick Leave) the village only pays for the medical examination. Instead of complying with Cmdr. Kenealy's request for times of the overtime, McGreal response was a sarcastic memo implying that he is the

-17-

expert on overtime pay. He is not! Such conduct is disrespectful and out of order.

Charge #7 is upheld and the Grievant is subject to disciplinary action up to and including discharge as he falsely testified while under an oath.

## CHARGE 8: Zorbas Complaint

On August 20, 2009, Ofc. John Zorbas requested permission to come to the station to complain about the actions of another officer. The other officer was Ofc. Losurdo. Ofc. McGreal attempted to join the complainant as Ofc. Zorbas's "Union Representative." As this was not a disciplinary interview, and as Ofc. Zorbas was coming in on his own accord to complain about another officer, there was no need for or entitlement to any union representative for Ofc. Zorbas. Nevertheless, Department supervisors Sgt. Farrell and Lt. Mitchell, allowed Ofc. Zorbas to have a union representative.

Once Lt. Mitchell and Farrell found out that Zorbas's complaint was about Ofc. Losurdo they refused to let Ofc. McGreal participate in the meeting because Ofc. McGreal had a history of problems and conflicts with Ofc. Losurdo, and had recently been involved in a verbal altercation with Ofc. Losurdo. Ofc. Zorbas was told to get another union representative. Ofc. McGreal reacted angrily to being told he could not participate in the Ofc. Zorbas' complaint, and loudly told Ofc. Zorbas not to tell the supervisors a *"God damn thing."* Ofc. McGreal was told to return to his beat. Sometime after this outburst, Ofc. McGreal was called back into the station to explain his inappropriate behavior. Ofc. McGreal apologized and stated to Lt. Mitchell and Sgt. Farrell that he wanted to represent Zorbas because he was afraid that Zorbas was '*stupid enough to tell you the truth."* The union president served as Ofc. Zorbas' union representative Ofc. Zorbas' complaint about Ofc. Losurdo was meritless.

## Village's Position

First, the Village contends this was a complaint not a disciplinary interview, so a Union Representative was not needed but uninvited McGreal arrived. Zorbas complaint was about Losardo and if true, Losardo not Zorbas might want a Union Representative. When they learned that Zorbas complaint was about Ofc. Losardo, they asked McGreal to leave as he and Losardo had ongoing disputes and didn't get along with each other. They allowed hin to stay until Union President Ahrandt arrived. Upset because he was being replaced, he became very angry and treated his superiors with contempt and disrespect which **violated General Order 26.2(F)**.

Lt. Mitchell ordered McGreal back to his beat and McGreal became irate and stomped out of the room. Before leaving he said to Ofc. Zorbas *"Don't say a goddamn word to these people. ")*. Being uncooperative is a **violation of General Order 26,2,2(J)**. Sometime after the outburst McGreal was called back into the station to explain his inappropriate behavior. He apologized and stated to Lt. Mitchell and Sgt. Farrell that he wanted to represent Zorbas because he was afraid that Zorbas *"was stupid enough to tell you the truth."*

### Union's Position

Ofc. Zorbas testified that when backing up Ofc. Losurdo he noticed that Losardo leaves suspects in their vehicle unsupervised. This is an unsafe practice and if he waits just a few minutes, the backup will arrive and can watch the car's other passengers while Losardo investigates the driver outside the vehicle. Unsupervised passengers can be hiding or disposing drugs and/or weapons or planning to reek mayhem. He spoke to Losardo about it many times but Losardo continued his bad habit. Believing this was dangerous practice which needed to be corrected, he thought his superiors could get Losardo to change. However, he didn't want to get his friend and fellow officer in trouble so sought advice from his Union Representative - Ofc. McGreal.

McGreal told him that he could file a complaint, but cautioned him that Lt. Mitchell would insist it be in writing and signed by Zorbas as the complainer. McGreal warned him that Losardo was one of Lt. Mitchell's favorites and might turn the table on him. Ofc. McGreal accompanied Zorbas to the meeting, but was dismissed as soon as Lt. Mitchell saw the complaint was about Losardo and replaced McGreal with Ofc. Ahrendt. Zorbas chose McGreal ·as his Union Representative as he was fully briefed on the problem but instead they provided Ahrendt. He was right as that is exactly what happened as instead of recognizing Losardo's unsafe practice, Lt. Mitchell and Sgt. Farrell found fault with Zorbas and threatened to punish him and tore up his complaint.

They managed to turn what was supposed to be a low level non-discipline meeting to alert them to a potential safety problem, into a disciplinary meeting for the messenger. The Union strongly contends that who to use as the Union Representative is up to the employee, not management. Zorbas wanted McGreal as he was fully briefed on the complaint and Ahrendt was not.

### Decision

Since scheduled to be a non-disciplinary meeting the complainer was not entitled to have a Union Representative assist him. However, if McGreal was a co-author of the complaint, which he probably was or as a witness to Losardo's alleged infractions he could have remained but not as a Union advocate. Even though they were not required to do so , they let Union President Ahrendt assist Zorbas in presenting the complaint. When the meeting revealed the possibility of discipline for Zorbas, the Union President was there to assist him.

Lt. Mitchell had the right to refuse to allow McGreal to attend the meeting, first because Zorbas was not entitled to Union Representation, and more importantly because the ongoing strained relationship between Losardo and McGreal. McGreal should have recused himself as he had a conflict of interest. Not only did McGreal view Losardo as a unwelcome rival, McGreal

-19-

and Zorbas lived in the same house.

As to the reported outburst when McGreal was not allowed to participate in the meeting. There is no doubt that he was disappointed and angry and upon reflection apologized his actions. He denies offering any derogatory comments when he left the room. However, Sgt. Farrell and Lt. Mitchell testified that McGreal did and they had no reason to concoct such a story.

Charge #8 is upheld and the Grievant is subject to disciplinary action

## CHARGE 9: Bike Patrol Complaint

While studying some of the FOIA papers which he requested , McGreal saw an e-mail concerning his off duty actions. On January 29, 2010, Ofc. McGreal submitted a written memorandum in which he alleged that on August 7, 2009 Lt. Mitchell had misused department resources and used members of the bike patrol to watch him, while he was not on duty and report back to him. He alleged that Lt. Mitchell violated the Illinois Personnel Record Review Act, Orland Park Village Ordinance and Orland Park Police General Order by gathering the information and distributing it via e-mail. Lt. Mitchell was not the bike patrol supervisor and those officers testified in Lt. Duggan's investigation that they were staking out for car burglars, not McGreal. By chance they observed Ofc. McGreal and Ofc. Marie Gomez leaving the Marcus Theater and mentioned it in a casual conversation with Lt. Mitchell. Meanwhile, Lt. Guerra notified Lt. Mitchell that McGreal would not be working that night as he was taking a worker's comp day. He combined these two pieces of information and e-mailed it the Comd. Kenealy.

### Village's Position

Note that this event took place long before Ofc. McGreal sought FOIA's, presented his cost reductions, made his hostile work environment claim and filed his Unfair Labor Practice. This matter was fully investigated by Cmdr. Duggan and again at this hearing and Ofc. McGreal never offered any meaningful rebuttal.

McGreal had called in that he would not be at work that night and said he was taking a workers' comp day. This confused Lt. Guerra as the injury had several day's before and the doctor had only authorized one day off. By e-mail she notified Lt. Mitchell that McGreal would not be to work as expected as he was taking a workers's comp day. Lt. Mitchell then reported to Comdr. Kenealy that he would be one patrol officer short that night. McGreal was at the movies, was taking a worker's comp day , and would not be working that night.

The bike patrol officers had not been assigned by Lt. Mitchell to watch McGreal. He was not even their supervisor and they were very offended that McGreal was accusing them of watching him off duty. Ll. Mitchell was passing internal advisory information to those who needed to know, especially since there was the possibility of worker's compensation fraud.

-20-

Ofc. McGreal made an unsupported and unnecessary complaint against a fellow member of the Department which is a **violation of General Order 26..2.4(T).**

### Union's Position

The Union contends that Lt. Mitchell violated the Illinois Personnel Review Act when he documented McGreal's off-duty associations and activities without his permission. He e-mailed this information to other supervisors and then claimed he was investigating a workman's compensation issue. There never was an investigation and Comdr. Kenealy approved the day off for the injury. The emergency doctor told him to see his own doctor before returning to work and the earliest appointment was in a few days. He reported back to work on the day his doctor released him.

### Decision

The injury involved in this case was a cut finger which McGreal considered to be minor and angrily protested when he was ordered, per regulation's , to be examined immediately as it was an on-the-job injury. It required several stitches and later McGreal thanked them forcing him to get it taken care of. The doctor said he could return to work in one day. Since it was the weekend, he decided, on his own, to make that one day his first scheduled work day.

The Village could have investigated, but didn't, taking a workman's compensation day after his scheduled three day weekend as the doctor only authorized a one day absence from work. After all, he wasn't scheduled to work that night so he was not entitled to any workman's compensation pay.

Lt. Mitchell's actions all fall within his legitimate duties and if he had not done so would have been guilty of negligence. This was information which needed to passed on in the operation of the police department. Lt. Mitchell took no action to penalize McGreal and Comdr. Kenealy approved the workmen's claim even though it probably should have been rejected. The emergency room doctor allowed him to miss one day and the healing process is the same even if that is a day he was not scheduled to work.

Ofc. Gomez said it best when interrogated by Cmdr. Duggan *"if the officers were being used to discretely follow her or Officer McGreal, while off duty, why would they send a text message to acknowledge that fact"*

One wonders whether this was just McGreal's way to get even for being forced to see a doctor in the first place.

Charge #9 is upheld and the Grievant is subject to disciplinary action

-21-

### CHARGE 10:  Leaving Beat And Idle On Duty

Having received a number of troubling complaints about Ofc. McGreal, Cmdr. Kenealy decided to review some  GPS recordings from the AVL log to learn  where, when, and what Ofc. McGreal was doing during his shift.   On Ofc. McGreal's November 11, 2009 shift he learned that from 2:40 a.m. to 4:31 a.m. there was no reported  activity and from McGreal's squad car was sitting idle at the Silver Lakes Country Club .  The Country Club is in Beat 3 and McGreal was assigned to Beat 4.  When questioned McGreal explanation was:-

*I was probably working on reports because I had to do more reports than anybody else because I had more arrest than anybody else..*

### Village's' Position

McGreal did not deny sitting in the country club parking lot for over an hour on that night.  Without any specifics, he claimed he was probably  working on reports or why he would be doing them in an out-of-site location.  He never  sought permission to leave his beat and to park in the Silver Lakes Country Club's parking lot which is in Beat 5.  This is a **violation of General Order 26.2.2(A)(17)** He failed to offer any evidence that other than his self-aggrandizing claim that he was doing anything other than being idle.  This is a **violation of General Order 26.2.2(A)(13).**

### Union's Position

It is clear that it is a common practice for police officers to meet up during the shift to discuss anything from work to personal issues.   GPS data can be faulty as it as shown during the hearing that it appeared that Ofc. Losurdo was idle for more than 3 hours but then determined there was a glitch in the system that showed the vehicle was idle when it was not.  Officers. Ahrendt, Losurdo, Stoettner, Grimmett, Zorbas, Slewoski and Lt. West all testified that they have all left their beats without seeking permission and been idle for a variety of reasons and never been disciplined.  Meeting car to car is a routine and necessary practice in police work.   In Lt. West's opinion, report writing, running radar and meeting up with another officer to exchange information is not considered being idle.

Cmdr. Kenealy testified that when he investigated the Silver Lakes Country Club incident , he learned that Ofc. Zorbas met car- to- car with Ofc. McGreal that night at the Country Club.  However, Zorbas was never investigated or asked about what and why he met with Ofc. McGreal .  Ofc. McGreal said that he used Silver Lake Country Club as he usually assigned to beat 4 or 5 which is in the area.  He had one of the highest DUI arrests and was most likely working on reports that night.  He did not neglect his duty that evening .  He responded to all calls and did everything he was supposed to do.  If a call had come in,  he would have been there in just a few minutes .  The evidence clearly demonstrates that Village is singling out Ofc. McGreal regarding a practice which is embraced by the  department.

-22-

### Decision

On November 11, 2009, Ofc. McGreal was out of his specific beat assignment, idle on duty, without express permission, while parked at Silver Lake Country Club for over an hour. Ofc. McGreal testified that he was just minutes away from his beat and was not idle as he was working on paperwork. He and other officers testified and GPS video's show that meeting up (huddle) with other officers to exchange information is a routine practice with police forces . The also testified that the accepted limit is about 20 minutes  and at least one of the two cars is within its assigned beat.

The Silver Lake Country Club's parking lot is secluded and not visible to the general public. The record shows there was not much going on that night as the incident report didn't show any activity between 3:24 a.m. to 4:24 a.m.  Even if he was doing paper work he did not need to be in a secluded place.  He should have been within his beat where his very presence deters crime and assures the surrounding public they are being protected.

Charge #10 is upheld Ofc. McGreal is subject to disciplinary action for being out of his beat without permission as it left residents without visible protection.

### Charge 11:  Court Appearance

On January 4, 2010, Ofc. McGreal neglected his duty when he failed to report for his assigned 9:00 a.m. court call at the Bridgeview Court Facility when he was scheduled to appear for 12 cases and had been under judicial subpoena commanding appearance for 5 court cases. Ofc. McGreal arrived in the court room at 10:35am, one and a half hours after his scheduled time.  On his time card he marked his arrival as 10:00 am.  The first court call ended at 10:30, so his scheduled cases were moved to the 2nd or 3rd call.  The judge notified the Police Chief of the Court's disappointment with the Orland Park Police for their lack of respect for the court. This information was passed on to Cmdr. Kenealy for investigation.

### Village's Position

On January 7, 2010 Cmdr. Kenealy sent notice to Ofc. McGreal regarding missing his court call .   Ofc. McGreal responded by e-mail waiving a meeting to discuss possible disciplinary action.  He also wrote that  two DUI Statutory Summary Suspension Hearings were held and called after his  arrival at court and both were upheld  due to his testimony.   A review of court  records revealed that in one of the cases (Christina Lara), the Summary Suspension of driving privileges was rescinded due to "No Reasonable Grounds."       In the March 24, 2010 interrogation, Ofc. McGreal testified, under oath, that he was sure that both cases were upheld.  Now, the story has changed and it was a "mistake."  He violated **General Orders 26.2.2(F) &(J).**

On January 25, 2010 McGreal sent a subsequent e-mail to Comdr. Kenealy restating his message about the two DUI cases being upheld because of his testimony and added.

> *"I would like to add that I was not an hour an a half late, none of my cases were dismissed and several of them pled guilty.."*

Contrary to his claims, the records show that he falsified his time card as he recorded a 10:00 arrival even though he completely missed his scheduled 0900 court call which ended at 10:30. He arrived at 10:35 and then falsified his time card which **violated General Orders 26.2.2(A)10, (F) & (J).**

### Union's Position

The Union argues that Office McGreal had some unexpected winter car problems and notified the Assistant States Attorney who rescheduled them for a latter time on the same day. He was there and testified when his cases were called.

There were two summary suspensions for him that day and he testified in both of them as well as several that were not his. He made a mistake when he said both of them were upheld. Ms. Lara the suspension was dismissed but the remainder was continued to March 30. That same day he testified as the support officer in several of their cases .

Officers. Ahrendt, Stoettner, Zorbas, and Antkiewicz all testified they have been late for court . Some provided valid reasons and were not penalized. The most severe discipline was a 5- day suspension for the second offense. This was the first offense for Ofc. McGreal who had a valid excuse and made the appropriate rescheduling to have the cases heard and for him to testify. Another example of singling McGreal out for punishment.

### Decision

Ofc. McGreal had multiple opportunities to explain why he put in for one-half hour extra overtime pay when he indicated is start time was 1000 and he did not arrive until 1035. Payroll falsification is a very serious matter.

While the Union claims that the Village had not done a sufficient investigation of the January 4, 2010 court records to determine the number, subject and outcome of the cases in which Ofc. McGreal testified. Cmdr. Duggan did a through investigation of the January court records including the stenographic records and it affirmed the Ofc. McGreal only testified in two DUI cases and they were his.

Charge #11 is upheld and the Grievant is subject to disciplinary action

## CHARGE 12: Obtaining Information Through L.E.A.D.S.

On November 5, 2009 at 2:20 am, Ofc. McGreal, using his Mobile Data Terminal (MDT) conducted a SOS/LEADS (Secretary of State)/Law Enforcement Agencies Data System) inquiry into Cmdr.. Kenealy's personal vehicle license plate and obtained Cmdr. Kenealy's attached personal information including his date of birth and drivers license number, while Cmdr. Kenealy's vehicle was parked legally in front of his home. Cmdr. Kenealy's take home police vehicle was also parked legally on his driveway in front of his home. Ofc. McGreal never took any action regarding the vehicle parked at Cmdr. Kenealy's residence.

### Villages's Position

Ofc. McGreal violated **General Order No. 82-1 and LEADS "Regulations and Policies** when he used his MDT to conduct a Secretary of State and LEADS inquiry into Cmdr. Kenealy's personal license plate, while Cmdr. Kenealy's vehicle was parked legally in front of his home. Ofc. McGreal could not provide a reason for conducting the inquiry into Cmdr. Kenealy's personal license plate. When asked in his January 21st interrogation During Ofc. McGreal's January 21, 2010 interrogation, Ofc. McGreal was asked if he ever ran a license plate of a vehicle that belonged to Cmdr. Kenealy. He replied, *"It's possible. I think he lives in town. It's possible."* When asked under what circumstances he would have run Cmdr. Kenealy's plate, Ofc. McGreal replied. *"Only if it was parked illegally on the street."*

It is evident that Ofc. McGreal knew or should have known that the legally parked vehicle belonged to Cmdr. Kenealy as evidenced by the length of time Ofc. McGreal has been employed by the Orland Park Police Department, and the fact that Cmdr. Kenealy's take home police vehicle was parked in the driveway of his residence.

### Union's Position

Ofc. McGreal does not recall the incident and does not know where Cmdr. Kenealy lives. He would only have run an unoccupied , parked vehicle license plate for enforcement purposes. If he found it was Cmdr. Kenealy's illegally parked vehicle, he would not have issued a citation because he did not want to be retaliated against.

### Decision

This is typical of Ofc. McGreal's response when he realizes that he is in trouble . Search for a crack in the other guy's armor. He attempted to quash the cell phone record subpoena by falsely claiming it was not his phone. Well into the hearing, he attempted to disqualify[9] the jointly selected arbitrator by contacting the NAA and when that didn't help, he contacted the FMCS and that too failed so he turned to the court and sought a injunction to have this hearing

---

[9] Appendix E - Motion to Recuse Arbitrator

-25-

stopped and transferred to the Illinois Labor Relations Board with representation by an attorney of his choosing. He continues to claim that nothing is ever his fault and tries to blame someone else for his troubles. It appears that he was looking for anything that he could use to turn the tables on Cmdr. Kenealy who he knew was investigating his actions.

Charge #12 is upheld and the Grievant is subject to disciplinary action

### CHARGE 13: Reporting Late for Duty (Roll Call).

On January 16, 2010 , Ofc. McGreal reported late for duty (26 minute) and (1) minute on February 24, 2010. In the past, Ofc. McGreal has reported late for duty on the following dates: July 15, 2005, April 2, 2006, January 11, 2008 and March 25, 2008, July 1, 2008 and 10/30/08 (court).

#### Village's Position:

As the record shows, he had been disciplined for being late in the past so Cmdr. Kenealy offered McGreal a pre-disciplinary meeting. McGreal wrote back that he was late, but complained that he was being treated differently than other employees and that four other officer had been late to roll call over the past three months. Cmdr. Kenealy, knowing McGreal routinely disobeyed verbal orders from supervisors, ordered him in writing, to provide information of the others who were supposedly late. McGreal provided the names of the four other officers, but no other details  Cmdr. Kenealy investigated and found three of the officers had excellent attendance records and no prior discipline for tardiness. One of them was actually late because he was helping an elderly neighbor who had fallen. The fourth officer was not late in the past three months, but had received a 3-day suspension for being late in September 2009. The January 26, 2010 instance, even though only 1 minute long was another violation of **General Order 26.2.2 (A-10)** according to departmental standards as he was not seated.

#### Union's Position

The Union argues that dates for lateness and their discipline, prior January 16, 2010, in accordance with the labor agreement contract , are too old to be considered. As to the January 26, 2010, he was having car problems and called Sgt. Malmborg. Ofc. McGreal denies that he was late 1 minute on February 24, 2010 as he was in the room but not yet seated. These is not a requirement for an officers to be sitting down in any general orders or policy

Other officers testified that they have been late for roll call and either given an oral reprimand, placed in the minor infractions file or not disciplined. Fellow officers testified as follows:  Ofc. Ahrendt late a couple of times - never disciplined; Ofc. Losurdo late - placed on minor infraction list; Office Grimmett late twice - oral reprimands; Ofc. Zorbas missed a shift - placed on minor infraction list; Ofc. Zorbas late a couple of times - no discipline; Ofc. Slewoski - late four times - received counseling and a written reprimand. Ofc. McGreal testified that in the

past if he was late, the supervisor handled it at the time and it was never an issue after that. Again the Union asserts that McGreal was being singled out for punishment.

## Decision

The purpose of discipline is to correct errant behavior and Ofc. McGreal was frequently violating rules. Instead of taking responsibility for his personnel actions and trying to correct the problems he chose to deny any responsibility and continued to disobey legal orders and regulations. Many of his improper actions could and should have been corrected by following a simple counseling advice, but he chose to lie and deny rather than admit he was wrong. In determining the appropriate penalty for violations a number of factors are considered. Past violations, years of service, conduct, attitude, amount, seriousness, etc. are used to increase or decrease the normal disciplinary action. Thus, the same violation does not necessarily require the same penalty as there are different past records and degrees of violation. Ofc. McGreal was already on slippery path and claimed he was being singled out. He was using every delaying tact he could to avoid discipline such as refusing to attend a pre-disciplinary hearing for being late to roll call. Comdr. Kenealy was forced to document the violation and decide on the penalty without McGreal's input. Who knows, he might have won this one.

Charge #13 is upheld and the Grievant is subject to disciplinary action

## CHARGE 14: January 21, 2010 - Interrogation.

On January 21, 2010, Ofc. McGreal was interrogated pursuant to the Uniform Peace Officers' discipline act and applicable General Orders of the Orland Park Police Department. Ofc. McGreal was provided with valid notice for said interrogation, which was continued to a date and time convenient for him and was represented at all times therein by an attorney of his choosing. Prior to the interrogation, Ofc. McGreal was warned, both orally and in writing, that he was required to tell the truth and that his failure or refusal to do so would result in disciplinary action up to and including the termination of his employment.

### Village's Position

Prior to the interrogation McGreal was advised of his rights and testified that he knew what they meant and had no questions about them. He was told that this was neither a criminal nor administrative investigation but rather an interrogation which is defined in the Uniform Peace Officer's Disciplinary Act as "any non -judicial hearing" which is authorized to recommend, approve or order the suspension, removal or discharge of an officer. At several points during the interrogation, despite said warnings, Ofc. McGreal was untruthful.

Without merit is McGreal's claim that he did not have sufficient notice of the interrogation and had no idea of what the interrogation was about. The notice described the incidents to be interrogated and he was personally involved and familiar with them. Also

without merit is his claim that he was entitled to know the disciplinary charges before the interrogation begin. This isn't required or even possible before he was interrogated.

McGreal testified that he understood that the answers he provided might be used in disciplinary action against him, that his failure or refusal to answer the questions truthfully and completely might be used in disciplinary action against him ,including possibly the termination of his employment, and that the Department's general orders requires him to answer all the questions and accurately. McGreal **violated General Orders 26.2.2(F&J)** as his testimony reveals he lied as follows.

A. October 27, 2009 traffic stop of Charles Robson, McGreal testified that he asked Mr. Robson to take specific field sobriety tests and explained what they were. (Int. Transcript. Pg. 15-16) (Audio/Video only reveals refusal of breathalyzer test before arrest and no field sobriety tests Ofc. Berthold, his backup, testified none were given.)

B. At his interrogation he affirmed that in the Robson Stop memo he wrote *" I do not have any recollection of the incident."* after verbally explaining the incident and viewing the video. (Village Ex. 57.pg 23)

C. Ofc. McGreal testified that he was not ordered to write a General Case Report for the October 27, 2000 traffic stop: (Village Exhibit #9 -McGreal's 11/23/09 memo is entitled "Direct Order for General Case Report:") (Sgt. Malmborg's testimony. (Int. Trans., pg. 59-80)\

E. When questioned about the Alslip pursuit, Ofc. McGreal testified that Sgt. Malmborg did not subsequently talk to him about the incident and tell him *"this better not happen again."* (Int. Transcript. pg. 60)

F. When questioned about the awards night incident, Ofc. McGreal denied that he told Cmdr. Kenealy that he had an upset stomach and claimed he just needed to use he rest room. (Int. Transcript. Pg. 89-90)

G. When questioned about the awards night incident, Ofc. McGreal testified that his getting up and leaving had nothing to do with Ofc. Losurdo being named Officer of the Year. He denied that *it was some kind of protest and he did not intend to get up and leave.* (Int. Transcript. Pg. 91-92)

H. When questioned about the sick call incident, Ofc. McGreal testified that he was sick: He testified *I had been sick all week. I had been so sick that I was visibly sick. Everyone knew I was sick, including Lt. Mitchell. I called in sick that night intending to go home and go to sleep.* (Int. Transcript pg 103)

I. When questioned about the Zorbas complaint, Ofc. McGreal denied that he had said *"Zorbas is stupid enough to tell you the truth."* or nothing like that. (Int. Transcript. Pg 150)

-28-

McGreal testified in the interrogation that he did not have any problems with Ofc. Losurdo. At this hearing numerous witness testified that McGreal did have a problem with Ofc. Losurdo including Ofc. Losurdo, Lt. Mitchell and Sgt. Farrell. Lt. Guerra testified that they had an altercation two or three months before the award ceremony.

McGreal testified that he did not orchestrate or participate in any effort to ostracize Officer of the Year Losurdo at Roll Call on Awards Night. Officers. Slewoski and Berthold both testified that McGreal and others intentionally sat in different seats to sit away from Ofc. Losurdo and that this was planned in advance and discussed prior to roll call.

### Union's Position

First the Union asserts that the Village failed to comply with the Uniform Peace Officers' Act (UPOA) and General Orders of the Orland Park Police Department. The Village failed to comply when the department failed to inform Ofc. McGreal in writing the nature of the investigation. While the department listed several incidences in the Notice of Interrogation, despite requests by Ofc. McGreal, refused to inform Ofc. McGreal whether the investigation was administrative or criminal. Additionally, the Notice of Interrogation failed to list all the names of the complainants against Ofc. McGreal.

Ofc. McGreal testified he did not lie during the interrogation. He did not lie that he asked Mr. Robson to take a field sobriety test. A big part of the interaction came after the microphone was turned off. He did not lie when he stated in his memorandum that he did not initially recall the traffic stop. He did not lie when he stated that he spoke with Sgt. Malmborg during the Alsip pursuit. He did not lie when he stated Sgt Malmborg did not talk to him about the Alsip pursuit after the fact. He did not lie when he told Cmdr. Kenealy that he had an upset stomach at the Awards night.

### Decision

While the Union contends the Village failed to comply with the UPOA, they did not enter it as an exhibit for this hearing. Regardless, McGreal had been asked by his supervisors about each of the incidents as they were his personal actions under review. The interrogation listed which incidents were going to be discussed. He was granted a one month delay to refresh his memory and prepare for the interrogation. He knew, which incidents were to be discussed and why he was being investigated, the possible outcomes and a chance to recant. To assure that he understood what was expected of him (most of all truthfulness) and possible outcomes were told to him at the start of the interrogation and he acknowledged that he knew and understood them.

The Union claims that because McGreal testified at this hearing that he did not lie during the interrogation. The facts provide a different interpretation.

-29-

A. His claim that he administered the field sobriety test is contrary to his backup's, Ofc. Berthold, testimony that McGreal did not. Even if he had it was after Robson was arrested not before as required.

B. His claim that he did not lie when he wrote in his memo that *"he did not recall the traffic call"* as the record shows that he explained what went on and then was told put that in the memo.

C. His claim that he did not lie when he spoke to Sgt. Malmborg during the Alsip pursuit. His own testimony in this hearing was that he didn't talk to Sgt. Malmborg because he had been instructed to just go there and not clutter up the airways.

D. His claim that Sgt. Malmborg didn't talk to him about the Alsip pursuit after the fact as he used that as a claim in this hearings that his discipline was *"that better not happen again."*

E. His claim that did not lie when he told Cmdr. Kenealy that he had an upset stomach is refuted as Cmdr. Kenealy said *McGreal rubbed his stomach* and from that point on McGreal continued to claim had been visibly sick for over a week.

Those are only a few of the instances the Village has charged him with. The Village proved multiple lies in the Forest Preserve incident, the Roll Call incident, the Sick Call incident, the Court Appearance, the January 21 Interrogation and the Phone Records. The Village brought forth multiple witnesses to support their claim that McGreal was lying The Union and McGreal have not introduced even a shred of evidence to rebut the Village's claims.

Charge #14 is upheld and the Grievant is subject to disciplinary action up to and including discharge as he falsely testified while under an oath.

## CHARGE 15: Insubordination - Investigation

On March 5, 2010. Ofc. McGreal was placed on paid Administrative Leave due to the ongoing internal investigations. When Ofc. McGreal was placed on Administrative Leave, he was ordered as follows:

*"You are further ordered to have no contact or discussion of any kind with any member of this department, citizen or complainant regarding these investigations."*

Ofc. McGreal received and understood this Order.

### Village's Position

Chief McCarthy put McGreal on paid administrative leave because the allegations against McGreal kept coming in and even moving McGreal from the midnight shift to the day

-30-

shift did not alleviate the problem.  Chief McCarthy ordered him to have no contact or discussion of any kind with any member of this department, citizen or complainant regarding these investigations.  On March 11, 2010 Comdr. Kenealy and Lt. Duggan held a meeting to discuss McGreal's conduct.

Ofc. Slewoski was called into the meeting just before midnight and ordered not to speak to anyone other than his union representative about the meeting.  Shortly after the meeting, McGreal contacted him and asked him about the meeting. He asked him about the events discussed at the meeting, what happened during the meeting and was trying to get information about the investigation.  Ofc. Slewoski refused to provide any information to McGreal because he had been ordered not to. (V. Ex. 54).

Likewise, Ofc. Berthold was called into the meeting and ordered not to speak to anyone about it. Shortly after he got out of the meeting, McGreal contacted him and wanted to know what happened at the meeting. Ofc. Berthold refused to provide any information to McGreal because he had been ordered not to. (V. Ex. 55)

McGreal when confronted with his own phone records and with the testimony of Officers. Berthold and Slewoski, he claimed that he never denied calling them but said the calls were not about the investigation. This is a **violation of  General Orders 26.2 (D & H), & 26.2.2(A)(7) .** When confronted with Officers. Berthold's and Slewoski's testimony and their memos, McGreal claimed they were lying. This is a **violation of General Order 26.2.2 (F).**

### Union's Position

Ofc. McGreal testified that when he was placed on administrative leave, he was ordered to have no contact with any member of the department, citizen or complainant regarding the investigation.  He testified that the did not have any contact relating to the investigation. He talked to Officers. Berthold and Slewoski about union matters. It would be improper for the Village and a violation of the tenants of just cause to discipline McGreal for communicating with his duly appointed Union representative regarding union matters, interferes with McGreal's rights to speak with his representative and would further interfere with the statutory duties of the union.

### Decision

McGreal admitted that he contacted Ofc.'s Berthold and Slewoski around midnight on March 11, 2010 about union matters. He swore, under oath, that he did not request or receive any information about the meeting that night. In his closing testimony at this hearing, he asserted that Berthold and Slewoski lied when they recanted their original response on Awards Night. He claimed they were pressured into lying if they wanted to keep their jobs. Quite the opposite is true!  They realized they had to tell the truth if they wanted to keep their jobs.  There were more Officers. than McGreal, Berthold and Slewoski at roll call that night and the Command Staff knew Ofc.'s Berthold and Slewoski were less than truthful when originally

-31-

questioned.

Charge #15 is upheld and the Grievant is subject to disciplinary action up to and including discharge as he falsely testified while under an oath.

## CHARGE 16:  Insubordination Phone Records

In March of 2010, Comdr. Duggan was conducting an investigation concerning the February 22nd "Hit &Run" accident involving Ofc. McGreal's personal vehicle.  Of interest was the time McGreal received a voice mail from Sgt. Slewoski about the accident.  The voice mail was sent the evening of February 22nd and McGreal said he didn't receive it until the next morning.  Ofc. McGreal agreed to bring in his cell phone records but in spite of periodic reminders, never did.

### Village's Position

The Village strongly asserts that McGreal's refused te deliver his cell phone records as first promised and ultimately ordered to is a **violation of General Orders 26.2(D),  26.2.2(A7) and 26.2.3(C)**

McGreal's continuing untruthfulness and refusal to obey legal orders is documented in the record as follows.  On April 8, 2010 McGreal's attorney notified Chief McCarthy that McGreal refused to provide the requested documents.  Immediately, Chief McCarthy, in writing, ordered McGreal to provide the records by noon on Friday, April 10th and if he does not do so, it will be considered a **violation of General Order 26.2.1 D (Disobedience of orders)** and could lead to discipline up to and including his discharge. (V. Ex. 58)  Ultimately, AT&T records showed that phone was switched from him to his mother on March 28, 2010 just two days after Lt. Duggan ordered him to deliver them. (V. Ex. 61)  On April 9th McGreal met with Chief McCarthy and told him that he never refused to provide the telephone records  and that he had tried without success to get them from AT&T because he was not the authorised user on the account.  The Company and the account holder both refused to provide them to him. (V. Ex. 59).

### Union's Position

The Union contends that the order from Lt. Duggan was illegal and thus Ofc. McGreal was not required to obey th order.  Furthermore, the orders were an invasion of his privacy rights and thereby a violation of the Federal Electronic Communications Act.  At the time of the order, the phone was registered to Ofc. McGreal's mother, not him.   This charge is related to the February 22, 2010 car incident.  The AT&T representative testified  that there as no way to know who had possession of the phone, made calls, received calls, answered voice mail, read text messages, sent text message nor the content of any of the calls to or from (708)372-1613.   She further testified that she  does not have any information showing that Ofc. McGreal did or did not call to request information regarding this account and someone other than Ofc. McGreal could

have been making payments on the account.

Next, the Union argues that any telephonic record submitted during this hearing was after acquired evidence which is inadmissible at a grievance arbitration concerning discipline. A discharge decision must generally stand or fall on the evidence which the employer had in possession at the time it acted. The Village continued to investigate and develop evidence against McGreal, including cellular telephone records registered to McGreal's mother. After he was terminated, the Village subpoenaed AT&T and received the cell phone records. The Union strongly asserts that the cell phone records should be deemed inadmissible and barred by the arbitrator.

Further, the Union asserts that this charge on the basis that it constitutes a violation of McGreal's fourth amendment rights when he refused to give up his personal cellular phone records. Of course, when he refused the Village framed his actions as "Failure to obey" and "fully execute a lawful order" pursuant to General Order 26-2-D. Such an order cannot remotely be considered lawful when it requires an employee to choose between foregoing his constitution rights under the Fourth Amendment and his continuing employment. Charge16 is based on an unlawful order by the Village and should be dismissed.

### Decision

Cmdr. Duggan's testimony that Ofc. McGreal agreed that he would produce his cell phone records is credible and McGreal's testimony that it was a illegal order is not. In his own 4//9/10 (V. Ex 59) memorandum he confirmed that in his 4/8/2010) meeting as follows:

> *I received a written order from you on 4/08/10 to provide the records. The order also stated that you were informed that I "refuse" to provide the telephone records." "That is not an accurate statement. I have never refused to provide the telephone records."*

Chief McCarthy had been notified by McGreal's attorney (Mr. Mazzone) that McGreal refused to give up his cell phone records. (V. Ex. 58). If he or his attorney believed it infringed on his privacy, this was the time to declare it. Also in that memo he confirmed as follows:

> *"I have persisted in my attempt to obtain the records to no avail"* and *"As we discussed in a meeting on 04/09/10. I had made several calls to AT&T and learned that the company will not provide me with the requested telephone records because I am not an authorized user on the account '* and *"As we discussed in a meeting on 04/09/10, I had made several calls to AT&T and learned that the company will not provide me with the requested telephone records because I am not an authorized user on the account.*

> *"I am unable to provide you with the documents because the company and the account holder both refused to provide the records to me.*

-33-

The AT&T representative explained that a simple phone call to them and properly responding to user specific identity questions are all that is needed to get a copy of their cell phone record. Apparently, he didn't tell his attorneys, Mr. Mazzone or Mr. Calcaterra that the authorized owner had just (3/28/2010) been switched to his mother. Had he informed them, they surely would have advised Ofc. McGreal that switching phone wouldn't prevent him obtaining the records for the period he was the authorized holder.

The Union had great concerns about being allowed to redact cell phone records in the past. That was not problem in this case as in the Motion to Quash" decision, it specifically ordered that McGreal and he Union could redact non-related calls before they were placed into evidence at the hearing. .

Charge #16 is upheld and the Grievant is subject to disciplinary action up to and including discharge as he falsely testified while under an oath.

### CHARGE 17: Lying to Superior Officer - Phone Records

On March 25, 2010 another use for the record arose when Officers. Berthold and Slewoski submitted memos stating that McGreal had contacted them seeking information about the Department's continuing investigation of McGreal. On March 26, 2010, Lt. Duggan verbally ordered Ofc. McGreal to bring in his cell phone (#708-372-1613) records pursuant to and as part of the ongoing internal investigations.

### Village's Position

Multiple OPPD records show Ofc. McGreal's phone number is 708-372-1613. AT&T records show that Joseph McGreal was the user, the billing party and the financially responsible party for cell phone numbers 708-372-1613 until March 26, 2010. From March 25, 2009 through March 26, 2010 Joseph McGreal was the only individual with any type of authority over this particular phone number and account. AT&T witness, Ms. Thomas testified that AT&T customers have a right to their records and can get them at any time. Even if the account holder closed the account, or transferred the account to another person, he could still get the records for their time.

McGreal was uncooperative in the Internal Review Investigation which is a **violation of General Order 26.2..3(D)** as he refused to deliver his phone records. The phone records for 708-372-1613 for February and March 2010 in Joseph McGreal were still under his name. Thus, he was able to obtain the records. He lied when he met with Chief McCarthy on 04/09/20 and said he had tried to get the records but couldn't because the phone was not in his name and the registered owner would not grant permission to release them. He then confirmed both lies by documenting them in his 4/9/10 memorandum to Chief McCarthy. Thus he violated General Order 26.2.3C). His two lies were **violations of General Order 26.2.2(F&J).**

<u>Union's Position</u>

The Union responds that its position here as in Charge #16

<u>Decision</u>

The preponderance of the evidence supports the charge. Incidently, with or without the phone calls made little difference as the Village already knew he was lying. Several of his fellow officers had already reported that McGreal called them shortly after the voice mail was received. His phone records were just affirmation of known facts.

Charge #17 is upheld and the Grievant is subject to disciplinary action up to and including discharge as he falsely testified while under an oath.

### Charge 18: Insubordination Failure to Report to Supervisor

Ofc. McGreal's personal vehicle was involved in a hit and run accident outside of the PF Chang's restaurant in Orland Park on February 22, 2010, which was witnessed by a member of the public and reported to the OPPD. The OPPD immediately attempted to contact Ofc. McGreal and determine what happened. On the evening of February 22, 2010 after the hit and run accident was reported to the OPPD Ofc. McGreal received a direct order from a superior officer, via a voice mail message left on his cell phone to immediately call Sgt. Siewert. According to his cell phone records (Village Exhibit #32) Ofc. McGreal received this voice mail message shortly after it was left , and knew that he was being ordered to call Sgt. Siewert immediately. Ofc. McGreal failed and refused to immediately call Sgt. Siewert and did not call Sgt. Siewert until the following morning.

### <u>Villages's Position</u>

The Village contends that Ofc. McGreal lied when he claimed that he contacted the department immediately after he heard the voice mail. Cmdr. Duggan asked for the phone records of Officers. McGreal, Zorbas, Antkiewicz and Gomez and received them from all except McGreal . Their phone records revealed that McGreal had called them that night and under sworn oath reported the conversation was about his vehicle. McGreal's records were subpoenaed and the times and nature of the calls revealed that he knowingly disobeyed Sgt Siewert's order to report immediately The phone records indicated that McGreal checked his voice mail four (4) times between the time Sgt. Siewert left the message and midnight. McGreal claims that he first heard the voice mail when as when he came to work on the 23rd, but the record shows the phone was not activated that morning so he heard the voice mail the night before . Therefore, he was lying when he claims that he called immediately after receiving Sgt. Siewert's order. **He violated General Orders 26.2.(D, 26.2.1(H)and 26.2.2(A7),)** as he got the message the same night and decided to ignore the order to immediately call the station.

-35-

### Union's Position

The Union responds that its position here as in Charge #16

### Decision

The preponderance of the evidence supports the charge.

Charge #18 is upheld and the Grievant is subject to disciplinary action

### Charge 19: March 2, 2010 Interrogation

McGreal was formally interrogate a second time on March 24,2010 . This interrogation was originally scheduled for March 3, 2010 but was continued at McGreal's request. McGreal was under oath during the interrogation and was given the same oral and written that he was given in the first interrogation. He was required to testify truthfully during the interrogation..

### Village's Position

McGreal, while under oath did not testify truthfully in the previous interrogation. This is a **violation of General Orders 26.2.2(F) & (J)**
He falsely stated that he was not aware that his vehicle was involved in an accident on February 22, 2010 until the morning of February 23, 2010. This is not true as Ofc. Zorbas and Ofc. Gomez confirmed that he talked to them the night of the accident. McGreal's girlfriend stated that she, not his father, drove McGreal home that night. The phone records indicated that McGreal checked his voicemail four (4) times between the time Sgt. Siewert left the message and midnight and the time he called Sgt. Siewert the next morning. McGreal couldn't have gotten the message in the morning, because his phone was not accessed in the morning. He did not "call right away" as soon as he got the message as he testified in the interrogation.

He was also untruthful when he testified about the Court case as he reported that due to his testimony in two DUI cases were upheld and he was sure that was true. It was not as one of them was not upheld.

### Union's Position

The Union responds that its position here as in Charge #16

The preponderance of the evidence supports the charge.

Charge #19 is upheld and the Grievant is subject to disciplinary action up to and including discharge as he falsely testified while under an oath.

-36-

### Grievance #2009-07  Hostel Work Environment

When he couldn't convince Lt. Mitchell to "settle on-shift" the Forest Preserve Incident (Charge #4); Ofc. McGreal contacted the Orland Park Human Relations Department to report that he was being targeted because of his Union activity. The Human Relations team met with Ofc. McGreal and MAP attorney Mazzone on December 9, 2009 to determine specific situations and supervisors to be investigated. Ofc. McGreal presented his Hostile Work Environment Complaint citing the following issues :

| | | |
|---|---|---|
| August 30, 2009 | - | Zorbas Complaint (Charge #8) |
| September 5,2009 | - | Right to Union Representation (ULP) |
| October 10, 2009 | - | Written Counseling - Unapproved Day off (ULP) |
| | - | Antkiewicz Excessive suspension ( Grievance ) |
| November 9,  2009 | - | Forest Preserve - Discipline (Charge #4) |
| November 9,  2009 | - | Hostel Work Environment Complaint (ULP) |
| November 16, 2009 | - | On-the-job injury (Charge #9) |
| November 23, 2009 | - | General Case Report  (Charge #2) |
| November 23, 2009 | - | October 27 Traffic Stop (Charge #1) |
| November 26, 2009 | - | Roll Call (Charge #5) |
| November 27, 2009 | - | Sick Call (Charge #7) |
| December 1,  2009 | - | Involuntary Transfer to day shift (ULP) |
| December 6,  2009 | - | Denial of Overtime (Charge #7) |
| Aug-Dec  9,  2009 | - | Denial of Restroom Breaks (ULP) |
| November 26, 2009 | - | Roll Call (Charge #6) |

On November 11, 2009 aware of continuing problems with Ofc. McGreal, Chief McCarthy ordered Lt. Duggan to conduct an internal interrogation of Ofc. McGreal's conduct. Lt. Duggan scheduled the first meeting for December 21, 2009, which at Ofc. McGreal's request was postponed to January 21, 2010.  On December 23, 2009, Ofc. McGreal filed a Hostile Work Environment (Unfair Labor Practice) complaint with Illinois Labor Relations Board . On January 5, 2010 Ofc. McGreal added a second document claiming the ongoing internal Police Department Investigation was retaliatory in nature.

Over the next month or so, HR Director Przybylski and Assistant Village Manager Baer interviewed the seven involved supervisors, three violated patrol officers and reviewed appropriate video/audio recordings, technology reports and other records deemed applicable. On February 10, 2010,  HR Director Przybylski  reported their findings as follows:

*In reviewing the items specified in this complaint we conclude that the actions by the supervisory staff were appropriate and were carried out as part of their duty in managing the conduct of their employees. Officer McGreal's complaint is unfounded, no evidence of retaliation or harassment exists.*

-37-

### Union's Position

The Union contends that the Command Staff was closely screening Ofc. McGreal's every action to find fault, no matter how tiny. When they did find even a slight infraction (i.e. 1 minute late) they disregarded the normal progressive discipline (Oral, Written, Suspension, Termination). They were out to get him for his continuing demand for enforcement of the Labor Agreement. They were angry that he made the Union Members aware of their rights for Union Representation (Weingarten Rights) when being questioned and forced the Village to conduct pre-disciplinary hearings as specified in the contract. He requested via the Freedom of Information Act (FOIA) documents which he used and prepared a plan to save the six police positions being considered by the Village for elimination. His plan included some reduction in pay and benefits such as take home cars for the Command Staff. Their reaction was to pressure him into resigning or as reported that Lt. Mitchell said *"fire his ass."*.

When they cited a violation, even without proof, his punishment for like violations by others would be far greater. Many of the incidents he is charged with are common and necessary practices in police departments, including Orland Park, such as speeding, in car meetings, self assigning incidents; and McGreal is the only one being disciplined .

Finally, the Union contends that his superiors were out to get him terminated as he was reigning in their dictatorial management style. So instead of counseling to educate Ofc. McGreal they chose to withhold discipline until they could discharge him based on quantity, not quality, of the charges. They even went so far as to violate his privacy rights by subpoenaing his mother's cell phone records in an attempt to add charges to their meager basket of charges. He is a intelligent, well educated and trained profession policeman whose actions may have "cause" for some discipline, but not nearly enough to satisfy the contract's "just cause" for discharge.

### Village's Position

The Village points out that McGreal failed to offer any evidence, other than his own self-serving testimony, that there was any union animus . His superiors testified that union animus did not exist as they have been union members, executive board members, union chapter presidents and true supporters of the unions . McGreal's own witnesses including all the Executive Board members testified that there were no signs of union animus and that McGreal's problems were not related to union activity. He filed the ULP without seeking approval of the Executive Board even though the board required three board member support before allowing grievances to go forward. Union President Ahrandt would not testify to validity of one document because it may have been altered which is one of the many problems he was having with Secretary McGreal.

McGreal was discharged because of his numerous acts of dishonesty, insubordination and blatant disregard for the rules, not because of any anti-union animus or retaliation for engaging in any protected activity. McGreal's unfair labor charges, grievances and his hostile work environment complaint contain essentially the same incidents. The hostile work environment was

-38-

throughly investigated by the Village's Human Relations Department and concluded the Supervisors had properly handled the cited instances . There was nothing to support McGreal's claims of a Hostel Work Environment or that he was being single out for his union activity. Further when department interrogated him, under oath, he was untruthful and uncooperative thereby delaying the investigation and resolution.

McGreal never made any claim of harassment or retaliation until after he was already in trouble for his own misconduct. He filed his first complaint against his supervisors on November 9, 2009 after the forest preserve incident. Before filing his complaint, McGreal called Lt. Mitchell on the phone and asked if the matter could be kept at shift level or if some kind of deal could be worked. Lt. Mitchell refused to ignore McGreal's lying and insubordination and refused to make a deal and the complaint immediately followed.

The most serious problem with Ofc. McGreal's conduct was his failure to tell the truth. This delayed resolution of incidents as it meant continuing the investigations until the truth could be verified. And then, under oath, he would deny and try to shift the blame to others. Or as in the case at this hearing , when his fellow officers, under oath, admitted they were untruthful when originally questioned, he claimed they were now lying. McGreal cited other officers who had lied but not been fired. Yes, some officers, including McGreal[10], may have lied while being questioned, but there is no evidence that any Orland Park officer ever lied under oath. McGreal cited Ofc. Diangi, but he testified that he never lied in court or any formal interrogation and was never proven to have lied.

The Village strongly asserts that all instances enumerated in his ULP complaint have been presented to the arbitrator, and McGreal and his attorney were provided with the Village Exhibits prior to entering them into this hearing. His attorney cross examined the Village witnesses and called in McGreal's witnesses. In June 2010, the MAP 159 executive committee voted to remove McGreal from the Board citing multiple (nine topics) as their reason. The Union and the Village both testified that everything is going nicely with McGreal gone. Likewise, the Village asks the Arbitrator to do the same.

### Concluding Discussion

### Village Remarks

The Village contends that Police Officers must be held to higher standards of trust, honesty and dependability as compared to other public and private sector employees. Chief McCarthy recognizes that truthfulness is important and required for a police officer and memorialized at the hearing as follows.

> ... *Police officers testify in court on a regular basis . And with the power that we*

---

[10] Called in sick but was taking a boat trip on Lake Michigan - one day suspension.

*have to arrest, search, seize and even take a life, testifying and reporting accurately and truthfully is critical to the integrity of the officer and to the integrity of the entire Police Department. So the foundation of policing is telling the truth.*

In the nineteen charges against, Ofc. McGreal ten of them documented one or more instances of untruthfulness. When confronted, under oath, Ofc. McGreal continued to lie and deny his infractions of legal orders and department rules.

Next, the Village points out that Police Departments are paramilitary organizations with a chain of command and orders. Orders are passed from the superior officer to the rank and file. The effectiveness of these organizations hinges on the compliance of the orders. Neglect of duty, insubordination, refusal to comply, and failure to cooperate with orders breaks down the effectiveness, efficiency and morale of the organization. The record shows that Ofc. McGreal has frequently and purposely failed to live up to expectations. The body of the nineteen charges shows his blatant disregard for compliance continues in spite of counseling, oral warnings, written warnings, and suspensions. By far and away the worst conduct his superior officers have observed in their decades as police officers.

Ofc. McGreal claims that union animus is the root of his problems but did not provide any evidence to support it. He knowingly and purposely violated countless rules and orders which had absolutely nothing to do with his duties as Chapter Secretary. His own witness's testified, the chapter's executive board testified, and the command staff testified that union animus is not, and never has been present in the Orland Park Police Department, because it doesn't.

Finally, the Village contends that McGreal's repeated and flagrant misconduct establishes the legitimate, non-discriminatory basis for his termination. The Village asks the Arbitrator to:

1. Find that there is just cause for the termination of Officer McGreal;
2. Affirm and sustain the termination of Officer McGreal on all respects;
3. Deny each of the three remaining grievances;
4. Rule the ULP Charge lacks merit and should be dismissed.

### Union's Remarks

The Union cites the widely recognized *"seven tests of just cause"* to determine whether there is just cause for termination. They failed to uphold their burden to prove there was just cause to terminate Officer McGreal as follows:

1) **NOTICE:** No notice of possible discharge before charging.
2) **REASONABLE RULES & ORDERS :** Varied Interpretation
3) **INVESTIGATION:** Incomplete investigations

-40-

**4) FAIR INVESTIGATION:** Targeted
**5) PROOF:** Marginal
**6) EQUAL TREATMENT:** Same violation - more severe penalty
**7) PENALTY:** Varied violation

The record shows that Officer McGreal was **not given notice** that he would be discharged for the violations charged. The **general order rule** regarding the audio recording ending requires Officer determination at the time, not weeks later. The **investigations were incomplete** and conducted without any appearance of impartiality before imposing discipline. The **investigations were not fair** as they appear to be discriminatory, anti-union reasons. The Village's level **of proof marginal** in spite of 14 complete hearing days and hundreds of exhibits. The testimony and exhibits confirmed that Officer McGreal was **not granted equal treatment**. Numerous other officers received either no penalty or a **minor suspension for like violations.**

The Union contends that this is a case of bruised egos, unsubstantiated allegations and personalty issues that conflict with Ofc. McGreal. This investigation began suspiciously as a series of investigations of very minor allegations where the department continued to persecute Ofc. McGreal in an attempt to gather enough evidence to terminate him. If the normal and accepted practice of timely prompt <u>progressive</u> discipline a fine working relationship could have emerged.

The Union asserts the level of termination - is excessive.

### Discussion and Award

The Union probably is right on target in suggesting that this entire case is about bruised egos. Lt. Mitchell and Ofc. McGreal know each other very well Mitchell was McGreal's on-the-job trainer and mentor, Maybe the problem s goes back to that time as Mitchell failed McGreal and extended the training period another six months. This had to be quite a shock and disappointment to the Chicago Academy's valedictorian. Highly intelligent individuals, like McGreal, are often very competitive and can't accept a loss. They are trapped by narcissim which drives them to never accept a loss. They become clever which is not always smart.

Becoming Chapter Secretary gave him the opportunity to show everyone how clever he was. He could find slight openings in the contract to cloud the intent of a rule and thus win. He considered it a major victory when he acquainted his fellow officers with the Weingarten Rights. Incidently, his interpretation is only partially correct and the contract's pre-hearing article fully meets the requirement. Getting a possibly a 3-days suspension reduced to 2-days through arbitration is hardly a major victory, as he claimed, a s the record still shows discipline. Lighting the fuse for the open battle occurred when McGreal felt Mitchell as the Sergeant's Union Representative hadn't upheld their pre-agreement on the Village's cost reduction meetings. Shortly thereafter, Mitchell refused to settle the Forest Preserve incident and the battle begin. Mitchell started to closely monitor McGreal and write him up for even minor offenses. The

-41-

incidents were McGreal's personal actions, not Union related. When his normal clouding of the intent of contract language failed such as the Robson Stop, he resorted to lying. He just had too win! Unfortunately it was a bad decision as Lt. Mitchell's personalty wasn't going to let him lose. In the long run Mitchell would win because he had the truth on his side. Sometimes, it takes a long time to prove a lie, but in a police department with great detectives, the truth will be found and the punishment will be far greater. The battle between the two of them continued while the investigations continued and more incident s were written up. Even minor incidents were reported such as McGreal's charge that Mitchell used the Bike Patrol to spy on him and Mitchell's charging McGreal for being one minute late for roll call. McGreal contributed his share of frivolous complaints like seeing him at the movie, unproven denial of restroom breaks and shift changes.

Joseph McGreal is a very intelligent individual who had to repeatedly lie to prove himself that he was a winner. Unfortunately, he was destined lose as the house always wins when they discover a cheater. I truly believe that Comdr. Kenealy and Chief McCarthy wanted to keep McGreal as he was a highly productive officer with lots of accommodations. Comdr. Kenealy approved the extra day of workers comp time which had earmarks of fraud. He also overlooked the overtime charge when charged for time he was not in court. Chief McCarthy transferred him to the day shift to get him away from his claimed hostel work environment.

At the first day of the hearing , I asked for argument briefing concerning the AT&T subpoena for McGreal's cell phone records. I became aware of the fact that his cell phone was switched on the day he was ordered to produce them. Obviously an attempt to derail the hit and run investigation involving his car. Now aware of that most of the charges against him had an element of lying about them, it would difficult to believe any testimony he might offer. I met privately with council and suggested a settlement instead of continuing a long, expensive set of hearings. They agreed that it was possible. Union council explained it to McGreal and then asked me to talk to McGreal. I did and he refused because I hadn't I haven't heard his defense. Therefore, the long expensive hearing continued for over a year. It has now been three years since the battle started and his refusal to accept defeat has been costly for him, his mother, his union and the village taxpayers.

As stated in my discussion of each charge, all but one has been upheld. The only one denied was the Alsip Pursuit which was over when Sgt. Malmborg settled in with counseling. Most of the other charges could have been settled and the message sent to Officer McGreal with a warning or short suspension. But the purposely an knowingly the process by lying and denying, especially when under sworn oaths, cannot be tolerated in police department,
/
I like the Human Relations Investigation Team found McGreal's problems were of his actions and not because of union animus. A preponderance of the evidence there was "Just and Sufficient Cause" to terminate the employment of Officer Joseph McGreal.

**<u>Award:</u>**

1. Grievance #2010-06 is denied.
2. Grievances #2009-02, 2010-03 & 2010-05 are denied .
3. Joseph McGreal was terminated for just cause and is so ordered.
4. The ULP charge lacks merit and should be dismissed.

*Dennis V. Stoia*
Dennis V. Stoia
Arbitrator

Dated this 14th day of November 2012
in Somonauk Illinois

-43-