# EXHIBIT 6

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JOSEPH S. McGREAL,                    )
                                      )
              Plaintiff,              )
                                      )
         vs                           )   NO. 12 CV 05135
                                      )
THE VILLAGE OF ORLAND                 )
PARK, an Illinois                     )
Municipal Corporation                 )
and a body politic, and               )
Chief of Police, TIMOTHY              )
McCARTHY, Individually,               )
and Patrol Commander                  )
THOMAS KENEALY,                       )
Individually, and Police              )
Lieutenant PATRICK                    )
DUGGAN, Individually,                 )
and Police Lieutenant                 )
JOSEPH MITCHELL,                      )
Individually, and                     )
Sergeant ANTHONY                      )
FARRELL, Individually,                )
and Sergeant SCOTT                    )
MALMBORG, Individually,               )
and Lieutenant JAMES                  )
BIANCHI, Individually,                )
                                      )
              Defendants.             )

         The evidence deposition of JOSEPH S.
McGREAL, called by the Defendants for
examination, pursuant to notice, and pursuant to
the rules of Civil Procedure for the District
Courts of the United States, taken before Cynthia
**A. Pavesich, a Notary Public and Certified**

1  Commander Kenealy if he was presented with this
2  information, and I would have been notified and
3  interrogated, and I wasn't.

4    **Q.** So this statement by Officer Walsh is not
5  accurate?

6    **A.** Correct.

7    **Q.** All right, the last one is Kystina Gomez,
8  and that's the officer that you dated for about a
9  year, right?

10   **A.** Yes.

11   **Q.** In the second bullet she reports that you
12  never threatened her or stalked her, correct?

13   **A.** Correct.

14   **Q.** And the second to the last bullet says that
15  he's kind of paranoid.

16        Did Officer Gomez ever tell you that
17  during your dating relationship that she thought
18  you were being paranoid?

19   **A.** No.

20   **Q.** You attended all of the hearings at the
21  arbitration proceeding; is that correct?

22   **A.** Yes.

23   **Q.** How many witnesses testified at the
24  arbitration proceeding?

1      **A. I don't know.**

2      **Q.** One of the Defendants in this case, Scott

3      Malmborg, he testified, correct?

4      **A. Yes.**

5      **Q.** And in your opinion did he provide false

6      testimony at his -- at the arbitration hearing?

7      **A. He did provide false testimony. I think he**

8      **admitted to that.**

9      **Q.** Anthony Farrell, he testified at the

10     arbitration hearing?

11     **A. Yes.**

12     **Q.** And in your opinion did Mr. Farrell provide

13     false testimony at the hearing?

14     **A. Yes.**

15     **Q.** Commander Kenealy testified at the hearing,

16     correct?

17     **A. Yes.**

18     **Q.** And in your opinion did he provide false

19     testimony pertaining to you?

20     **A. Yes.**

21     **Q.** And did Mr. Duggan testify at the

22     arbitration hearing?

23     **A. Yes.**

24     **Q.** And in your opinion did he provide false

1    testimony against you?

2        A. Yes.

3        Q. Chief McCarthy testified at the arbitration

4    hearing, correct?

5        A. Yes.

6        Q. In your opinion did he testify falsely

7    against you?

8        A. Yes.

9        Q. Stefano Przybylski, did she testify at the

10   hearing?

11       A. Yes.

12       Q. Did she provide false testimony against

13   you?

14       A. No, she didn't. As far as I remember, she

15   did not. She just said I do not know to about

16   200 questions. So she did not provide false

17   testimony as far as I can remember.

18       Q. And did an individual named Linda Thomas

19   testify at the hearing?

20       A. I believe so.

21       Q. And who is Linda Thomas?

22       A. I don't know. I think she was an employee

23   of AT&T.

24       Q. And was her testimony at the hearing false

1    in any way?

2         A. I don't remember her testimony.

3         Q. Did a Troy Siewert, S-i-e-w-e-r-t, did he

4    testify at the hearing?

5         A. Yes.

6         Q. And who is he?

7         A. He's a Sergeant.

8         Q. And in your opinion did he provide false

9    testimony against you?

10        A. No, I don't believe so.

11        Q. Laura Guerra, she testified at the hearing,

12   right?

13        A. Yes.

14        Q. In your opinion did she provide false

15   testimony against you?

16        A. Yes.

17        Q. Officer Kovac, did he testify at the

18   hearing?

19        A. Yes.

20        Q. In your opinion did he provide false

21   testimony against you?

22        A. Yes.

23        Q. Officer Slewoski, he testified at the

24   hearing, right?

1    A. Yes.

2    Q. Did he provide false testimony against you?

3    A. I believe he changed his story. I don't
4  remember if it was false testimony, but he
5  provided two different versions of the same story
6  while both under oath.

7        So at some point he lied. I don't
8  remember if it was actually in the hearing or if
9  it was before the hearing.

10    Q. And you say he lied. So the lie -- And we
11  went through this earlier in your testimony. So
12  I'm not going to go over it again.

13        But it's your opinion that he lied with
14  respect to something you did, right?

15    A. It's not in my opinion. It's Chief
16  McCarthy's opinion that Slewoski and Berthold
17  lied, and I believe they were both disciplined
18  for lying about something to do with me.

19    Q. Did Officer Slewoski ever provide any false
20  statements about you?

21    A. He must have if he lied, but I don't
22  remember if it was at the hearing or before the
23  hearing.

24    Q. Well, didn't Officer Slewoski testify that

CYNTHIA A. PAVESICH & ASSOCIATES   (312) 214-1992

1   you contacted him on the phone after being told

2   not to talk to anyone about what happened at the

3   awards ceremony?

4      **A.** I was told not to contact them about the

5   **investigations that they were investigating me**

6   **for, and I didn't.**

7          **I don't know what he told them, what he**

8   **told the supervisors; but I didn't contact them**

9   **about anything to do with the investigations.**

10     **Q.** And assuming that he did testify that you

11  did contact him, would that be a false statement?

12     **A.** Not if -- I did contact him but not about

13  **the investigation.**

14     **Q.** About what happened at the awards ceremony.

15     **A.** Not about the investigations, no.

16     **Q.** So you're saying you didn't do that?

17     **A.** Correct.

18     **Q.** So if he testified that, in fact, you did

19  do that, then that's false testimony on his part;

20  is that right?

21     **A.** If he did, yes.

22     **Q.** How about with respect to Officer Berthold,

23  did he testify at the arbitration hearing?

24     **A.** I believe he did, yes.

1     **Q.** And did he give any false testimony in your
2     opinion about you at that hearing?
3     **A.** Yes.
4     **Q.** Ron Ahrendt, he testified at the hearing,
5     right?
6     **A.** Yes.
7     **Q.** And in your opinion did he provide false
8     testimony about you?
9     **A.** Yes.  Well, **false testimony, not about me.**
10    **Q.** And earlier in your deposition didn't you
11    testify that Mr. Ahrendt, in his memo where they
12    sought your removal as the secretary of the
13    Board, that he made false statements in that memo
14    about you?
15    **A.** Yes.
16    **Q.** Chris Losurdo, did he testify at the
17    hearing?
18    **A.** Yes.
19    **Q.** Did he, in your opinion, make false
20    statements against you at the hearing?
21    **A.** Yes.
22    **Q.** Do you know Rick Stoetner, S-t-o-e-t-n-e-r?
23    **A.** Yes.
24    **Q.** Who is he?

1    **A.** He's a police officer, and he was on the

2    union local Executive Board.

3    **Q.** And in your opinion did Officer Stoetner

4    provide false testimony against you at the

5    hearing?

6    **A.** No.

7    **Q.** Did Officer Stoetner testify at the

8    arbitration hearing that he believed you should

9    be removed as the secretary from the union?

10   **A.** It's possible.

11   **Q.** And do you disagree with his testimony in

12   that regard?

13   **A.** I disagree with him, but he may have

14   testified to that.

15   **Q.** Who's Jim Grimmett, G-r-i-m-m-e-t-t?

16   **A.** A police officer and on the local Executive

17   Board of the union.

18   **Q.** And was he on the union board at the time

19   that you were removed as the union secretary?

20   **A.** Yes.

21   **Q.** And in your opinion did he provide false

22   testimony at the hearing against you?

23   **A.** I can't remember.

24   **Q.** Is it possible?

1      **A. Yes.**

2          MR. DeROSE: Objection to what's possible

3  but go ahead.

4  BY MR. CONDON:

5     **Q.** Officer Zorbas, he testified at the

6  hearing, correct?

7      **A. Yes.**

8     **Q.** In your opinion did he provide false

9  testimony against you?

10     **A. No.**

11     **Q.** Officer Tom, I'll spell the last name,

12  A-n-t-k-i-e-w-i-c-z, do you know that officer?

13     **A. Yes.**

14     **Q.** Did he testify at the hearing?

15     **A. Yes.**

16     **Q.** Did he provide false testimony, in your

17  opinion, against you?

18     **A. No.**

19     **Q.** Who is John Bush?

20     **A. A police officer.**

21     **Q.** And did he testify at the hearing?

22     **A. Yes.**

23     **Q.** And in your opinion did he provide false

24  testimony against you?

1      A. No.

2      Q. How about Peter DiAngi, is he an officer at

3   the Department?

4      A. Yes.

5      Q. And did he testify at the arbitration

6   hearing?

7      A. Yes.

8      Q. In your opinion did he provide false

9   testimony against you?

10     A. Against me, no.

11     Q. Did he provide any false statements --

12     A. Yes.

13     Q. -- at the hearing?

14     A. Yes.

15     Q. Did Mr. Bush make any false statements at

16   the arbitration hearing?

17     A. No.

18     Q. Tom Hottinger, H-o-t-t-i-n-g-e-r, who's he?

19     A. He was a Sergeant.

20     Q. And he testified at the hearing, right?

21     A. I don't remember if he did or not.  He may

22   have.

23     Q. You don't remember anything about his

24   testimony?

1      A. No.

2      Q. To your knowledge has Sergeant Hottinger

3  ever made any false statements against you?

4      A. I don't remember if he testified.  I don't

5  remember him making any statements.

6      Q. Kystina Gomez, she testified at the

7  hearing?

8      A. Yes.

9      Q. And in you opinion did she provide any

10 false testimony against you?

11     A. No.

12     Q. Paul Grimes, did he testify at the hearing?

13     A. Yes.

14     Q. And what's his position?

15     A. Village Manager.

16     Q. And in your opinion did he make any false

17 statements against you at the hearing?

18     A. I believe so, yes.

19     Q. All right, we've just gone through the list

20 of people that testified at the arbitration

21 hearing.

22     A. That wasn't the complete list.

23     Q. Who did we miss?

24     A. I think there was more than that.  It

1    should be in the arbitration transcripts.

2       Q. Anyone you can think of that I didn't

3    cover?

4       A. No, but I'm sure there's more than that.

5       Q. And I want to make sure that I'm accurate

6    in the list and also in terms of previous

7    deposition testimony that you've given in the

8    case, okay?

9       A. Mmm-hmm.

10      Q. Is my list comprehensive in terms of the

11   police officers or individuals that you believe

12   either gave false testimony against you at the

13   hearing or provided any false statements about

14   you relating to your employment at Orland Park?

15   Okay, and that list is?

16      A. That's not what you asked me.  It's any

17   false statements at all, not just to do with me.

18      Q. Okay, well, we'll go through, and if you

19   want to correct the list, you tell me, okay,

20   because my list consists of people that you

21   contend, in your opinion, have either given false

22   testimony against you or made false statements at

23   any time about you, okay?

24      A. Yes.

1          MR. DeROSE:  I want to object to the form

2     of the question because now you're testing his

3     recollection when he's already told you that the

4     names you've already given him he does not

5     believe is all inclusive of all witnesses, but go

6     ahead and try it again and let's see if he agrees

7     it's now --

8          MR. CONDON:  Okay, your objection is noted,

9     John.

10    BY MR. CONDON:

11        **Q.** Scott Malmborg, correct?

12        **A. Yes.  What are we --**

13        MR. DeROSE:  What's the question?

14        MR. CONDON:  Do you want to read the

15    question back, please?

16               (Question read by the reporter.)

17    BY MR. CONDON:

18        **Q.** You understand the list I'm going through

19    now?

20        **A. Yes.**

21        **Q.** Okay, Scott Malmborg?

22        **A. Yes.**

23        **Q.** Anthony Farrell?

24        **A. Yes.**

1    **Q.** Tom Kenealy?

2    **A. Yes.**

3    **Q.** Pat Duggan?

4    **A. Yes.**

5    **Q.** Chief McCarthy?

6    **A. Yes.**

7    **Q.** Linda Thomas?

8    **A. I don't know.**

9    **Q.** You don't know if she -- Okay, I'll take

10   her off the list.   Laura Guerra?

11   **A. Yes.**

12   **Q.** Timothy Kovac?

13   **A. You got the name wrong.**

14   **Q.** Officer Kovac, what's his first name?

15   **A. Ken.**

16   **Q.** Ken?

17   **A. Yes.**

18   **Q.** Officer Slewoski?

19   **A. Yes.**

20   **Q.** Officer Berthold?

21   **A. Yes.**

22   **Q.** Officer Ahrendt?

23   **A. Yes.**

24   **Q.** Officer Losurdo?

1      **A.** Yes.

2      **Q.** Officer Grimmett?

3      **A. Possibly, yes.**

4      **Q.** Officer DiAngi?

5      **A. Yes. Well, no, that was -- His false**

6      **statements were not about me. They were about**

7      **himself.**

8      **Q.** But did he provide false statements at the

9      hearing in your opinion?

10     **A. Yes, not to do with me though.**

11     **Q.** And Paul Grimes?

12     **A. Yes.**

13     **Q.** Did an Officer West testify at the hearing?

14     **A. Possibly.**

15     **Q.** Do you recall his testimony?

16     **A. No.**

17     **Q.** Okay, I just read to you 13 individuals

18     from the arbitration hearing and now going on to

19     people you've already testified to, and I want to

20     make sure I have the list right.

21            Same question, Karen Smith?

22            MR. DeROSE: Wait a minute. Say the

23     question again so I got it. Now these are

24     people --

1          MR. CONDON:  People who either testified

2     falsely against him at the arbitration hearing or

3     have given false statements against him as a

4     police officer in Orland Park.

5          MR. DeROSE:  All right.

6     BY MR. CONDON:

7       Q. Karen Smith?

8       A. I don't know.

9       Q. Assuming that that's what she testified to.

10          We went through that that's a false

11     statement on her part?

12      A. I don't know.

13      Q. Officer Walsh?

14      A. Yes.

15      Q. Officer Ford?

16      A. Yes.

17      Q. Officer Sanchez?

18      A. Yes.

19      Q. All right, we've just gone through 17 names

20     of individuals who you believe either gave false

21     testimony against you at the hearing or have made

22     false statements against you.

23          Have we missed anybody from the Orland

24     Park Police Department who you believe has either

1  testified falsely against you or made any false
2  statements about you?
3  **A. No.**
4      MR. DeROSE:  As far as you know.
5      THE WITNESS:  **As far as I know, right.**
6      MR. CONDON:  I'm only asking him.
7      MR. DeROSE:  I understand; but, counsel,
8  that's -- I don't want him to say you haven't
9  missed anybody.  He doesn't really know.  He's
10  got a whole list of people.
11      THE WITNESS:  **There might be more, but I**
12  **can't think of any right now.**
13      MR. CONVERY:  I thought you already
14  testified, John.  I'm sorry.
15      MR. DeROSE:  Put me under oath.  I'm ready.
16          (Whereupon, McGreal Deposition
17           Exhibit No. 42 was marked for
18           identification.)
19          (Document tendered.)
20  BY MR. CONDON:
21  **Q.** Showing you what we've had marked as
22  Exhibit 42, do you recognize this document?
23  **A. No.**
24  **Q.** You've never seen this document before?

1    A. I may have, but it's not addressed to me.
2    It's not written by me.
3    Q. Was this document an exhibit at the
4    arbitration hearing?
5    A. It's possible. There were several thousand
6    documents. I can't remember all of them.
7    Q. Do you want to take a minute to read it?
8        MR. DeROSE: Yeah, let me read it. Go
9    ahead, counsel.
10   BY MR. CONDON:
11   Q. All right, showing you what we've had
12   marked as Exhibit 42, have you had a chance to
13   review it?
14   A. Yes.
15   Q. Exhibit 42 is a memo from Commander Kenealy
16   to Chief McCarthy dated April 29th, 2010,
17   correct?
18   A. Yes.
19   Q. And it references the pre-disciplinary
20   meeting that Commander Kenealy had with you,
21   Lieutenant Duggan and your attorney on
22   April 28th, 2010, correct?
23   A. Yes.
24   Q. If you go to the second paragraph about the

# EXHIBIT 7

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JOSEPH S. McGREAL,           )
                             )
            Plaintiff,       )
                             )
        vs                   )   NO. 12 CV 05135
                             )
THE VILLAGE OF ORLAND        )
PARK, an Illinois            )
Municipal Corporation        )
and a body politic, and      )
Chief of Police, TIMOTHY     )
McCARTHY, Individually,       )
and Patrol Commander         )
THOMAS KENEALY,              )
Individually, and Police     )
Lieutenant PATRICK           )
DUGGAN, Individually,        )
and Police Lieutenant        )
JOSEPH MITCHELL,             )
Individually, and            )
Sergeant ANTHONY             )
FARRELL, Individually,       )
and Sergeant SCOTT           )
MALMBORG, Individually,       )
and Lieutenant JAMES         )
BIANCHI, Individually,       )
                             )
            Defendants.      )

        The evidence deposition of JOSEPH S.
McGREAL, called by the Defendants for
examination, pursuant to notice, and pursuant to
the rules of Civil Procedure for the District
Courts of the United States, taken before Cynthia
**A. Pavesich, a Notary Public and Certified**

1    A. Their disciplinary files.

2    Q. And each of those you believe had a

3 disciplinary record that was more serious or

4 larger than yours was?

5    A. Yes.

6    Q. And what do you base that upon?

7    A. Well, the most serious offense I was

8 charged with was lying.  Four or five guys were

9 charged with the same offense, and they didn't

10 lose their job.  They got minimal suspension

11 days.

12          Additionally, there's other officers

13 that were investigated for serious criminal

14 offenses which I don't know the status of, but

15 I'm awaiting discovery, and I was not charged

16 with any criminal offenses.  So that's more

17 serious.

18    Q. Who do you know that was -- I'm sorry.

19          What officers were charged with criminal

20 offenses?

21    A. I'm awaiting discovery.

22    Q. Do you know of anybody?

23    A. I've heard rumors of Officer Pete DiAngi,

24 Officer Kenneth Kovac, Officer Scott VanWagner.

1   All these guys have been investigated.  I don't

2   know the status of the investigations for

3   criminal offenses.

4       Q.  But those three you believe were charged

5   with criminal offenses?

6       A.  No, they were investigated for criminal

7   offenses, and they were disciplined more

8   seriously for whatever policy violations.

9           So their disciplinary file is more

10  serious than mine which includes speeding to

11  armed robbery calls and being out of my beat and

12  other petty minor violations.

13      Q.  Well, if we categorize these three guys

14  that you mentioned that had -- were accused, if

15  we can use that term, accused of criminal

16  activity, that would be someone that had a

17  serious charge against them, okay.

18          Do you know of any other police officers

19  that had the number of charges against them that

20  you had?

21      A.  I'm awaiting discovery.  At this time I

22  don't know.

23      Q.  You don't know of anybody?

24      A.  (Witness nodded.)

1  Q. You have to answer.

2  A. At this time I don't. I'm awaiting

3  discovery.

4  Q. Well, we'll see if we can find that list so

5  we can go through the list. Let's see what we've

6  got.

7  You've got Scott VanWagner. What were

8  the charges against him that made his record

9  worse than yours?

10  A. I am awaiting discovery.

11  Q. So you don't know -- Do you know whether or

12  not his record was more serious than yours?

13  A. I do.

14  Q. And how do you know that?

15  A. Because he told me.

16  Q. So what were the charges against him?

17  A. I don't know.

18  Q. Well, what did he tell you?

19  A. He's told me he's been in trouble over the

20  years, and I have not been in trouble over the

21  years. So I'm assuming, and I'm awaiting

22  discovery to find out.

23  Q. Did he tell you that you should not have

24  been fired in his view?

CYNTHIA A. PAVESICH & ASSOCIATES   (312) 214-1992

1    **A.  No, we didn't discuss that.**

2    **Q.**  Why was he telling you -- Did he tell you

3    that he thought his record was worse than yours?

4    **A.  No.**

5    **Q.**  Who was the other one that you named,

6    William somebody?

7    **A.  William Kazmierczek.**

8            MR. DeROSE:  Can you spell that?

9            THE WITNESS:  **I don't know.**

10           MR. DeROSE:  Can you take a shot at it?

11           MR. WALL:  We've got the list here I think.

12                   (Document tendered.)

13   BY MR. WALL:

14   **Q.**  So what I've been handed here is -- this is

15   Defendant Timothy McCarthy's responses to

16   Plaintiff's first request for production of

17   documents, and your request number 30 is the

18   full, complete and un-redacted disciplinary files

19   for Officer Kenneth Kovac, K-o-v-a-c, Officer

20   William Kazmierczek, K-a-z-m-i-e-r-c-z-a-k,

21   William Sanchez, Peter DiAngi, D-i-A-n-g-i,

22   Kenneth Lynch.

23           MR. DeROSE:  Can you hold on a minute?

24           MR. WALL:  Sure.  We can probably get a

1  copy of this at lunchtime, John.

2      MR. DeROSE:  That's all right.  Go ahead.

3      MR. WALL:  Charles Kirby, Scott VanWagner,

4  Thomas Antkiewicz, A-n-t-k-i-e-w-i-c-z, Kenneth

5  Rosinski, R-o-s-i-n-s-k-i, and Sergeant Jason

6  Ford.

7  BY MR. WALL:

8      **Q.** Do you believe that each one of these

9  individuals had a -- had more disciplinary issues

10  within the Department than you did?

11      MR. DeROSE:  Or more serious do you mean?

12      MR. WALL:  Yeah, either way, any way you

13  want to qualify it or quantify it.

14      THE WITNESS:  **More serious, yes.**

15  BY MR. WALL:

16      **Q.** Each one of these?

17      **A.** Yes.

18      **Q.** How was Officer Kenneth Kovac's record

19  worse than yours?

20      **A.** **I haven't seen it yet.  I'm awaiting**

21  **discovery.**

22      **Q.** What is the basis for asking for his file

23  then?

24      **A.** **Because I know he has a track record of**

1 being disciplined several times throughout my
2 tenure there and before I was there, and I know
3 he has a personal relationship with one of the
4 Defendants, and I know that he submitted a memo
5 lying about something that I did.

6       MR. WALL: Read his answer back.

7            (Answer read by the reporter.)

8 BY MR. WALL:

9     **Q.** Was he disciplined more times than you've
10 been disciplined?

11     **A.** We're awaiting discovery.

12     **Q.** So right now you don't know?

13     **A.** Correct.

14     **Q.** Same question for Kazmierczek, why do you
15 believe that his record is worse than yours?

16     **A.** Based on my experience working with him.

17     **Q.** Has he been disciplined more than you've
18 been disciplined?

19     **A.** I'm awaiting discovery.

20     **Q.** So right now you don't know?

21     **A.** Correct.

22     **Q.** What about William Sanchez, has he been
23 disciplined more than you've been disciplined?

24     **A.** I'm awaiting discovery.

1    **Q.** And right now you don't know whether or not

2    that's true or not?

3    **A. Based on my experience that is true.**

4    **Q.** So what in your experience would tell you

5    that?

6    **A. Well, at least one case he was involved in,**

7    **a pursuit, and was not terminated. I was**

8    **allegedly involved in a pursuit, and I was**

9    **terminated.**

10    **Q.** Okay, anything else?

11    **A. I'm awaiting discovery.**

12    **Q.** So right now you don't know of anything

13    else other than that?

14    **A. Correct.**

15    **Q.** What about Peter DiAngi, what is his record

16    and how is his record worse than yours?

17    **A. I don't remember exactly. I do remember he**

18    **was in trouble a lot. I'm awaiting discovery.**

19    **Q.** How was Kenneth -- How is Kenneth Lynch's

20    record worse than yours?

21    **A. I don't remember. I'm awaiting discovery.**

22    **Q.** How is Charles Kirby's record worse than

23    yours?

24    **A. I don't remember. I'm awaiting discovery.**

1    **Q.** And how is Scott VanWagner's record worse
2    than yours?
3    **A. Same answer.**
4    **Q.** And how about Thomas Antkiewicz?
5    **A. Same answer.**
6    **Q.** And what about Kenneth Rosinski?
7    **A. Same answer.**
8    **Q.** And what about Sergeant Jason Ford?
9    **A. Same answer.**
10   **Q.** Was that the complete list of individuals
11   that you believe had had worse records than you
12   had or involved in more serious violations or
13   more violations?
14   **A. That's the list I submitted, yeah.  I can't**
15   **think of any right now, any more.**
16   **Q.** Any more individuals right now?
17   **A. Correct.**
18   MR. WALL:  This a good time for lunch if
19   you don't mind, John.
20   MR. DeROSE:  Any time.
21   MR. WALL:  Thank you, half hour, 1:20.
22              (Whereupon a recess was taken.)
23   MR. WALL:  We're starting again at 1:30.
24   Please mark this as Exhibit No.  19.

1    **Q.** Request number four, what knowledge do you

2    have that James Bianchi disclosed any information

3    to the City of Joliet relating to your employment

4    with the Village of Orland Park?

5    **A. I'm awaiting discovery.**

6    **Q.** Do you have any now?

7    **A. No.**

8    **Q.** What knowledge do you have that James

9    Bianchi disclosed any information to the City of

10   Mokena regarding your employment with the Village

11   of Orland Park?

12   **A. I'm awaiting discovery.**

13   **Q.** Do you have anything now?

14   **A. No.**

15   **Q.** What knowledge do you have that James

16   Bianchi disclosed any information to any person

17   after June 27th regarding your employment with

18   the Village of Orland Park?

19   **A. I'm awaiting discovery.**

20   **Q.** Do you have any now?

21   **A. No.**

22   **Q.** Did James Bianchi make the decision for the

23   Village of Orland Park to discharge you?

24   **A. Yes, he was part of it.**

**CYNTHIA A. PAVESICH & ASSOCIATES  (312) 214-1992**

1    together and prepared the charges against you?

2    A. The charges had already -- From the Chief's

3    testimony, the charges had already been prepared,

4    and they encouraged him and recommended

5    termination, and he signed the statement of

6    charges seeking my termination based only on

7    their recommendations.

8    Q. What did Lieutenant Bianchi do after

9    June 27th, 2010 to retaliate against you?

10   A. He participated in the termination of my

11   employment. He continued to investigate me for

12   criminal matters that I did not commit.

13   Q. Everything we've already talked about?

14   A. Correct.

15   Q. What did he do after June 27th to support

16   your claim of intentional infliction of emotional

17   distress?

18   A. He terminated my employment unlawfully

19   which led to me losing everything that I own and

20   my career.

21   Q. Do you have any knowledge that James

22   Bianchi did anything to disclose any information

23   about you to any prospective employer of you?

24   A. I'm awaiting discovery.

1    **Q.** Well, you deny -- Well, your denial then of

2    request number ten is based upon this letter?

3    **A.** Yes.

4    **Q.** And anything else?

5    **A.** No.

6    **Q.** Let's go to request number 12, and this

7    says Plaintiff is unaware of any information

8    disclosed to the City of Joliet regarding

9    Plaintiff's employment with the Village of Orland

10   Park that was not encompassed by or contemplated

11   under the terms of Exhibit E attached hereto.

12         So if you look at Exhibit E in the

13   request, you'll find the release that you signed,

14   correct?

15   **A.** Yes.

16   **Q.** What information was disclosed that was not

17   encompassed or contemplated under the terms of

18   Exhibit E?

19   **A.** I don't know. I'm waiting on discovery for

20   that.

21   **Q.** Do you know of any now?

22   **A.** No, I don't know of any now.

23   **Q.** And you didn't know of any when you

24   answered this some weeks ago, right?

1     A. Right.

2     Q. So let's go to Exhibit No. -- I'm sorry,

3     request number 13, and that asked Plaintiff is

4     unaware of any information disclosed to the City

5     of Mokena regarding Plaintiff's employment with

6     the Village of Orland Park that was not

7     encompassed by or contemplated under the terms of

8     Exhibit F attached hereto.

9         Again, if you refer to Exhibit F in the

10    request, which you have in front of you, that's

11    the release that you signed, correct?

12    A. Yes.

13    Q. And what information was passed to Mokena

14    that wasn't encompassed by or contemplated under

15    the terms of Exhibit F?

16    A. Same answer as request number 12. I don't

17    have that information at this time.

18    Q. So you don't know of any, correct?

19    A. Correct.

20    Q. Let's go to request number 14, and it says

21    Plaintiff is unaware of any present or former

22    Village of Orland Park police officer with a

23    negative disciplinary record equal to or greater

24    than Plaintiff, and you said you don't have

1    A. Yes.

2    Q. Do any of these officers that are listed

3  here that weren't in that other list, do you know

4  if any of those had a disciplinary record that

5  was worse than yours either by quantity or

6  quality?

7    A. Bianchi, Kazmierczek, VanWagner,

8  Antkiewicz, DiAngi, Sanchez, Berthold and

9  Slewoski and I think we left off Ken Lynch and

10  Ken Kovac.

11    MR. DeROSE: Keep your voice up so we can

12  hear you clearly.

13    MR. WALL: Would you read my question back,

14  please?

15    (Question read by the reporter.)

16  BY MR. WALL:

17    Q. And those officers that you just listed had

18  disciplinary records worse than yours either by

19  quantity or quality?

20    A. Yes.

21    Q. What was in Bianchi's disciplinary record

22  that made it worse than yours?

23    A. I'm awaiting discovery.

24    MR. DeROSE: Objection, counsel. Counsel,

1     he said I can't answer it until I see the

2     records.  He said I can't answer that question.

3     BY MR. WALL:

4       **Q.** Okay, and my question is:  What do you know

5     now today to support the claim that you've just

6     made that these individuals, their records were

7     worse than yours?

8       **A. I was working with them for five years, and**

9     **they were investigated for serious policy**

10    **violations.**

11      **Q.** Okay, let's take James Bianchi.

12            Which one -- What was in his record that

13    made his record worse than yours?

14      **A. I have to wait to review the record.**

15      **Q.** What do you know now regarding his record

16    that makes it worse than yours?

17      **A. I need to review the record.**

18      **Q.** Do you know of anything now in your mind --

19      **A. I know that he's been investigated several**

20    **times by the Department, and I need to review the**

21    **records to determine what for.**

22      **Q.** But you don't know anything right now?

23           You don't have any facts right now to

24    establish that his record was worse than yours?

1    A. Well, he was investigated for participating

2    in a police pursuit.

3    Q. Okay.

4    A. And I was accused of the same thing except

5    I didn't actually participate in the pursuit and

6    he did, and he got a less severe punishment.

7         But he was involved in a police pursuit

8    outside the jurisdiction of Orland Park without

9    authorization and without telling anybody where

10   he was going and what he was doing, and he got a

11   one-day suspension.

12   Q. What else do you know about Lieutenant

13   Bianchi's disciplinary record that would make it

14   worse than yours?

15   A. I'm waiting for discovery.

16   Q. So right now you don't know anything more

17   than what you just told us?

18   A. Right.

19   Q. What do you know about Officer Christopher

20   Losurdo's record that makes it worse than yours?

21   A. I'm waiting for discovery on all of them.

22   Q. So right now you don't know of anything?

23   A. Yes.

24   Q. And would that be true of the rest of the

1    contain any reference whatsoever to June 28th,

2    2010, you have no other evidence that there was a

3    meeting on June 28th, 2010?

4    **A.** **I'm awaiting discovery.** **I do not have it**

5    **right now.**

6    **Q.** No, I'm asking you what you know as you sit

7    here today when you filed that lawsuit against

8    Lieutenant Mitchell. I want to know what

9    information you had on June 28th, 2010?

10    MR. DeROSE: On that date he didn't have

11    any information. He only learned it from the

12    arbitration. That's clear, counsel.

13    MR. CONVERY: Let me just clarify.

14    BY MR. CONVERY:

15    **Q.** As you sit here today do you have any

16    specific information other than whatever is in

17    the arbitration hearing that a meeting took place

18    on June 28th, 2010 that Lieutenant Mitchell

19    attended?

20    **A.** **I'm awaiting discovery.**

21    **Q.** I'm going to read back my question.

22    (Question read by the reporter.)

23    THE WITNESS: **Yes.**

24

**CYNTHIA A. PAVESICH & ASSOCIATES (312) 214-1992**

1    BY MR. CONVERY:

2       Q. And what knowledge do you have that a

3    meeting took place?

4       A. I reviewed memos throughout my hundreds of

5    FOIA requests, and there was memos from Mitchell,

6    Kenealy, Duggan and the Chief back and forth all

7    throughout that week.

8              I don't remember exactly, but I'm

9    waiting for discovery to get the dates, and I'll

10   let you know.

11      Q. But can you identify that there was any

12   memo that says that there was a meeting that took

13   place on June 28th, 2010?

14      A. I don't have it right now.

15      Q. You don't have what right now?

16      A. I don't have a memo from June 28th right

17   now.

18      Q. And do you have any personal knowledge that

19   such a memo exists?

20      A. I think it does.  During my review of all

21   the memos for the arbitration hearing, I actually

22   reviewed all the memos that Lieutenant Mitchell

23   wrote to the Chief, and they were in that same

24   time period.  So it's possible, yes.